391 P.3d 1225

**The STATE of Arizona, Appellee,**

v.

**Jeremy David MILLIS, Appellant.**

**No. 2 CA–CR 2015-0368**

Court of Appeals of Arizona,
Division 2.

Filed March 9, 2017

---

**36**

Mark Brnovich, Arizona Attorney General, Joseph T. Maziarz, Chief Counsel, Phoenix, By Kathryn A. Damstra, Assistant Attorney General, Tucson, Counsel for Appellee

Dean Brault, Pima County Legal Defender, By Robb P. Holmes, Assistant Legal Defender, Tucson, Counsel for Appellant

Judge Miller authored the opinion of the Court, in which Presiding Judge Staring and Judge Espinosa concurred.

## OPINION

MILLER, Judge:

¶ 1 A jury found Jeremy Millis guilty of one count of intentional or knowing child abuse under circumstances likely to result in death or serious physical injury and one count of first-degree murder, both committed against a victim under age fifteen. Millis was sentenced to life imprisonment without the possibility of release for thirty-five years for murder, to be followed by a consecutive ten-year prison term for child abuse. On appeal, he contends the trial court erroneously precluded expert testimony about his autism, he was prejudiced by a duplicitous charge, and the court erred by allowing the victim's mother to be accompanied at trial by a facility dog.[1] We affirm for the following reasons.

---

1. Although cases refer to victim/witness support dogs using many different terms, *see, e.g., People v. Spence,* 212 Cal.App.4th 478, 151 Cal.Rptr.3d 374, 400 n.4 (2012) ("therapy dog" or "support canine"); *State v. Jacobs,* 2015-Ohio-4353, ¶ 19, 2015 WL 6180908 (Ohio Ct. App. Oct. 21, 2015)

## Factual and Procedural Background

¶ 2 "We view the facts and all reasonable inferences therefrom in the light most favorable to upholding the jury's verdict[s]." *State v. Causbie,* 241 Ariz. 173, ¶ 2, 384 P.3d 1253, 1255 (App. 2016). Millis and S.F. began dating in 2012 and after a few months they began sharing an apartment. Not long after that, the relationship ended and Millis moved out, but they remained on good terms with one another. In order to help offset the cost of the lease that S.F. now bore on her own, Millis agreed to watch S.F.'s two young sons one day a week while she was at work.

¶ 3 On the morning of January 24, 2013, S.F. changed the diaper of her eight-month-old son, C.K. He had no bruises on him. She later took some pictures of C.K. "having a lot of fun ... and being very smiley" in his bouncer. Millis arrived to babysit the boys and she left for work at around 2:00 p.m. Millis was the only person watching the boys while S.F. was at work.

¶ 4 S.F. arrived home around 11:00 p.m. She looked in on the boys and they appeared to be asleep. Millis told S.F. that C.K. had been coughing and choking earlier that night, but S.F. was not worried because she knew C.K. had a condition called tracheomalacia, a "floppiness" in the cartilage of the trachea that sometimes caused him to make choking sounds, cough, or wheeze. Millis left and S.F. went to bed.

¶ 5 C.K. woke up at about 2:30 or 3:00 a.m. and S.F. tried to feed him a bottle. He did not eat much, but seemed to go back to sleep after about fifteen or twenty minutes. Then at about 5:30 a.m., C.K. started crying in a way that "didn't sound right. It wasn't his normal cry." S.F. picked him up but he would not open his eyes or respond to his name, and she had to hold his head up.

¶ 6 S.F. rushed C.K. to the hospital, which was across the street from her apartment. When they arrived at the emergency room, the staff took him right away, but he began

("companion dog"); *State v. Dye,* 178 Wash.2d 541, 309 P.3d 1192, ¶ 1 (2013) ("comfort animal" or "facility dog"), we use the term "facility dog" in this opinion because that is the term our legislature elected to use in a newly enacted statute on the subject, *see* A.R.S. § 13–4442.

having seizures. At 6:53 a.m., S.F. texted Millis and told him something was wrong with C.K.—he was crying "weird" and was nonresponsive. Millis replied that C.K. had been "a little weird when he did that cho[ ]king thing" the night before. She asked if C.K. had hit his head on anything, and Millis replied, "I don't think so. Just from him sitting on the carpet and tip[p]ing over ... [b]ut nothing bad." She told Millis C.K. was "seizing" and had a "head bleed," to which Millis replied, "Oh my god. Maybe that's what he was doing last night. I didn't know what he was doing. I squeezed his neck a little [because] he was having trouble breathing. He cried a little then went back to sleep so I thought he was fine." In a subsequent recorded confrontation call, Millis told S.F. he had found C.K. "stiff" and making "gasping noises" at one point, and had responded by "squeez[ing] his neck" "firm[ly]."

¶ 7 C.K. had bilateral subdural hematomas, which caused bleeding on both sides of his brain, bruising, and swelling. Analysis of a CT scan indicated the head trauma had occurred within approximately the last twenty-four hours, and could not have been the result of C.K. merely falling back onto carpet from a seated position. His fontanel was also bulging, and in each eye he had "too many [retinal hemorrhages] to count" across all layers of the retina. C.K. also had bruises on his head, ears, neck, chin, upper arms, shoulders, and "wrap[ping] around" his chest and rib cage. Numerous medical professionals testified that C.K.'s injuries were not consistent with an accidental fall, but were consistent with blunt force head trauma, intentional choking, and violent shaking.

¶ 8 C.K. died on January 30, five days after he was admitted to the hospital. A forensic pathologist opined that the date of the injuries was five to six days prior to death. The pathologist ruled C.K.'s death a homicide and determined the co-equal and interrelated causes of death to be (1) blunt force trauma to the head, and (2) hypoxic ischemic injury,

which is a lack of oxygen and blood to the brain.

¶ 9 S.F. was interviewed by investigating detectives the day C.K. was admitted to the hospital. She showed them her text message exchange with Millis. They located Millis, advised him of his *Miranda*[2] rights, and he agreed to an interview. When they confronted him with information about C.K.'s head injuries, Millis told the detectives he had accidentally hit C.K.'s head on the oven door while he was taking food out of the oven, even though he had denied any head injuries when he was texting with S.F. while she was at the hospital. He also told the detectives that C.K. had been "crying a lot" and that he had "choked [C.K.]" with his hand. In a second Mirandized interview after C.K. died, Millis again admitted he had been "frustrated" with C.K., "just wanted him to stop crying," and "chok[ed]" him to get him to quiet down, adding that he "just couldn't take it anymore" and "I did what I did."[3] Millis also told his ex-wife in a recorded jail video call that "he [had] choked [S.F.'s] baby."

¶ 10 At trial, Millis argued the blunt force trauma alone could have caused the brain swelling, which in turn could have choked off oxygenated blood to the brain, causing the hypoxic ischemic injury notwithstanding any strangulation. However, the forensic pathologist testified that the blunt force trauma alone could not account for certain injuries noted on an MRI. In closing, Millis argued that his choking the baby was not what killed him, that S.F. had inflicted the injuries that caused C.K.'s death after he had left that night, and that "shaking plus impact explains the [whole] universe of injuries that we have." In the alternative, he argued he had choked C.K. recklessly or negligently, not intentionally.

¶ 11 The jury convicted Millis of all charges and he was sentenced as described above. We have jurisdiction pursuant to A.R.S. §§ 13–4031 and 13–4033(A)(1).

---

**2.** *See Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** At another point, Millis told the detective that he had only "squeezed" C.K.'s neck because C.K. was having trouble breathing and Millis was trying "to see if there was something there, if he could move [the neck] around."

## Preclusion of Expert Testimony

▪ ¶ 12 Millis argues the trial court erred by precluding a defense expert from testifying Millis suffers from autism spectrum disorder (ASD) when it concluded that the proffered testimony was diminished capacity evidence as opposed to character trait evidence. We review a ruling to admit or preclude expert testimony for an abuse of discretion. *State v. Wright*, 214 Ariz. 540, ¶ 5, 155 P.3d 1064, 1066 (App. 2007). Because Millis opposed the state's motion to preclude the testimony and made an offer of proof, we review for harmless error. *See* Ariz. R. Evid. 103(a); *State v. Henderson*, 210 Ariz. 561, ¶ 18, 115 P.3d 601, 607 (2005).

¶ 13 Before trial, defense counsel filed a motion to assess Millis's competency pursuant to Rule 11.2(a), Ariz. R. Crim. P. Counsel attached to the motion the opinion of Dr. Pablo Stewart, who concluded in relevant part that Millis suffers from ASD without accompanying intellectual or language impairments. Relying on the testimony of two other experts who rejected that diagnosis, the trial court found Millis competent to stand trial.

¶ 14 Millis asked to continue the trial in order to accommodate Dr. Stewart's schedule so that he could testify about the ASD diagnosis. The state moved to preclude any ASD testimony, which it characterized as evidence of diminished capacity. Defense counsel argued the ASD diagnosis would not be offered to show diminished capacity, but to show Millis had a character trait of "difficulty in understanding how to interact appropriately with others," which could have made it "more or less likely that he formed the intent required in this particular case." After a hearing at which Millis made an offer of proof, the trial court granted the state's motion to preclude Stewart's testimony, finding it was offered to support a diminished capacity defense and was not character evidence. The court also denied Millis's motion to continue the trial.

▪ ¶ 15 Arizona does not recognize a "diminished capacity" defense, in which expert psychiatric evidence about a defendant's mental incapacity is offered to negate mens rea. *State v. Mott*, 187 Ariz. 536, 540–41, 544, 931 P.2d 1046, 1050–51, 1054 (1997); *see State v. Schantz*, 98 Ariz. 200, 212–13, 403 P.2d 521, 529 (1965). Unlike insanity pursuant to A.R.S. § 13–502(A)—an "affirmative defense that excuses, mitigates, or lessens a defendant's moral culpability due to his psychological impairment"—the diminished capacity defense aims to rebut an element of mens rea. *Mott*, 187 Ariz. at 540, 931 P.2d at 1050. The court in *Mott* observed that our legislature declined to adopt a diminished capacity defense when given the opportunity, *id.* at 540–41, 931 P.2d at 1050–51, and instead confined "any consideration of characteristic behavior associated with mental disease" to its bearing on an insanity defense,[4] *Clark v. Arizona*, 548 U.S. 735, 762, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006); *Wright*, 214 Ariz. 540, ¶ 15, 155 P.3d at 1069.

¶ 16 In *Mott*, our supreme court affirmed preclusion of evidence that "battered-woman syndrome" and low intelligence diminished the defendant's capacity to decide to seek medical care for her child. 187 Ariz. at 544–45, 931 P.2d at 1054–55. Similarly, in *State v. Buot*, 232 Ariz. 432, 306 P.3d 89 (App. 2013), the defendant sought to introduce evidence that he had "behavior consistent with an intermittent explosive disorder and that his actions are reflexive and therefore impulsive and not the result of a conscious thought process." *Id.* ¶ 11. We affirmed preclusion of the evidence because it was offered to rebut a knowing or reckless mens rea for a second-degree murder charge. *Id.* ¶ 20; *see also* § 13–502(A) ("impulse control disorders" cannot underpin insanity defense). And in *State v. Lopez*, 234 Ariz. 465, ¶¶ 20–23, 323 P.3d 748, 752 (App. 2014), we affirmed the preclusion of evidence of a defendant's purported character trait of "acting impulsively under stress without being aware of the consequences of his actions," reasoning that the only relevance of such evidence was for an impermissible diminished capacity defense.

---

**4.** This limitation comports with due process. *Clark v. Arizona*, 548 U.S. 735, 769–71, 126 S.Ct.

2709, 165 L.Ed.2d 842 (2006).

¶ 17 Millis contends that Dr. Stewart's testimony would not have rebutted an intentional or knowing mens rea, which he agrees would violate Arizona law, but instead would have established a lesser mens rea that would allow the jury to convict on reckless or negligent child abuse. Conviction for a lesser-included offense would also result in an acquittal on the felony murder charge. *See* A.R.S. § 13–1105(A)(2). The state correctly notes the circular nature of this argument. Evidence that a person only acted with a mental state of recklessness or negligence necessarily means the person did not act knowingly or intentionally. *See* A.R.S. § 13–105(10). Millis acknowledged this purpose when defense counsel explained at the motion hearing the evidence would show "that being on the autism spectrum made Jeremy Millis less likely to be able to form certain intent." Thus, the trial court did not abuse its discretion in determining that Stewart's proffered testimony was inadmissible diminished capacity evidence under *Mott* and its progeny.

¶ 18 Millis argues in the alternative that Dr. Stewart should have been allowed to present limited "observation evidence" about Millis's character traits without mentioning the ASD diagnosis. *See Clark*, 548 U.S. at 757–58, 126 S.Ct. 2709 (defining "observation evidence" as "testimony from those who observed what [the defendant] did and heard what he said," including "testimony that an expert witness might give about [the defendant's] tendency to think in a certain way and his behavioral characteristics"); *see generally Buot*, 232 Ariz. 432, ¶ 13, 306 P.3d at 92; *Wright*, 214 Ariz. 540, ¶¶ 13–17, 155 P.3d at 1068–69. But he did not clearly present this argument to the trial court, nor did he cite *Clark* or its discussion of observation evidence below. To the contrary, his offer of proof specifically emphasized that Stewart needed to opine that Millis suffers from ASD. *Cf. Clark*, 548 U.S. at 757–60, 126 S.Ct. 2709 (distinguishing admissible "observation evidence" from inadmissible "mental-disease evidence," i.e., "opinion testimony that [the defendant] suffered from a mental disease with

features described by the witness"). We do not address an argument made for the first time on appeal. *See State v. Flores*, 160 Ariz. 235, 238, 772 P.2d 589, 592 (App. 1989).

¶ 19 Millis's reliance on *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981), is unavailing. In that case our supreme court held that expert testimony about the defendant's purported character trait of impulsivity was admissible to rebut the premeditation element of first-degree premeditated murder. *Id.* at 34–35, 628 P.2d at 582–83. But subsequent cases have clarified that *Christensen* is only applicable in the context of premeditated murder. *See Lopez*, 234 Ariz. 465, ¶ 22, 323 P.3d at 752. Here, the jury was only instructed on felony murder, not on premeditated murder.

### Duplicitous Charges

¶ 20 Millis next contends duplicitous charges deprived him of his right to a unanimous jury verdict.[5] Specifically, he argues some jurors could have concluded the child died from blunt force head trauma while others could have concluded he died from a lack of oxygen to the brain caused by choking. He did not object on this basis below; therefore, our review is limited to fundamental error. *Henderson*, 210 Ariz. 561, ¶¶ 19–20, 115 P.3d at 607–08. A denial of the right to a unanimous jury verdict constitutes fundamental prejudicial error. *See State v. Delgado*, 232 Ariz. 182, ¶ 19, 303 P.3d 76, 82 (App. 2013).

¶ 21 The right to a unanimous jury verdict is established in the Arizona Constitution. Ariz. Const. art. II, § 23. In the context of statutes describing offenses that may be committed in multiple ways—sometimes referred to as "alternative-means" or "single unified offense" statutes—the jury must be unanimous as to whether the charged criminal act has been committed. *State v. West*, 238 Ariz. 482, ¶¶ 13, 19, 362 P.3d 1049, 1055, 1056 (App. 2015). "However, 'the defendant is not entitled to a unanimous verdict on the precise manner in which the act was commit-

---

5. Millis does not argue he faced a duplicitous indictment. *See generally State v. Klokic*, 219 Ariz. 241, ¶¶ 10–13, 196 P.3d 844, 846–47 (App. 2008) (distinguishing between duplicitous indictment and duplicitous charge).

ted'" as long as there is substantial evidence to support each of the charged means of commission. *Id.* ¶¶ 13, 15, *quoting State v. Herrera,* 176 Ariz. 9, 16, 859 P.2d 119, 126 (1993). The jury may reach a verdict "based on a combination of alternative findings." *Id.* ¶ 13, *quoting State v. Dann,* 220 Ariz. 351, ¶ 79, 207 P.3d 604, 620 (2009).

■ ¶ 22 First-degree murder is a single unified offense. *See, e.g., State v. Tucker,* 205 Ariz. 157, ¶¶ 50–51, 68 P.3d 110, 120 (2003), *citing Schad v. Arizona,* 501 U.S. 624, 643–45, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991); *see also State v. Gomez,* 211 Ariz. 494, n.3, 123 P.3d 1131, 1135 n.3 (2005) (affirming conviction where six jurors found first-degree felony murder and six found first-degree premeditated murder). It is unified because the harm the murder statutes seek to prevent is the same—the death itself. *See State v. O'Laughlin,* 239 Ariz. 398, ¶¶ 7–9, 372 P.3d 342, 345–46 (App. 2016) (distinction between statutes describing single unified offense rather than multiple offenses "often relies on the harm resulting from the crime"). Thus, jury unanimity is not required about the precise mechanism of death. *See Schad,* 501 U.S. at 631–32, 111 S.Ct. 2491, *citing Andersen v. United States,* 170 U.S. 481, 500, 18 S.Ct. 689, 42 L.Ed. 1116 (1898) (immaterial whether murder victim died by shooting or drowning; government need not charge these alternatively); *see also State v. Payne,* 233 Ariz. 484, ¶ 81, 314 P.3d 1239, 1263 (2013) ("jury need not be unanimous as to the theory of first degree murder as long as all agree that the murder was committed"), *quoting Gomez,* 211 Ariz. 494, n.3, 123 P.3d at 1135 n.3.

¶ 23 Similarly, child abuse under circumstances likely to produce death or serious physical injury pursuant to A.R.S. § 13–3623(A) is also a single unified offense. *West,* 238 Ariz. 482, ¶¶ 19–22, 362 P.3d at 1056–57. Although the crime can be committed in three different ways, the statute "focuses on a single harm to the victim." *Id.* ¶ 21, *quoting State v. Paredes-Solano,* 223 Ariz. 284, ¶ 14, 222 P.3d 900, 906 (App. 2009); *see Payne,* 233 Ariz. 484, ¶¶ 80, 88, 90, 314 P.3d at 1262,

1263–64 (whether committed by failing to feed or failing to provide medical care, child abuse is "only one crime"). Thus, a child abuse defendant does not have a right to jury unanimity as to "the precise manner in which the act was committed." *West,* 238 Ariz. 482, ¶ 30, 362 P.3d at 1059, *quoting Herrera,* 176 Ariz. at 16, 859 P.2d at 126.

■ ¶ 24 Here, the trial court instructed the jury that in order to convict Millis of first-degree felony murder, the state was required to prove (1) the victim's death occurred in the course of and in furtherance of the predicate felony (intentional or knowing child abuse under circumstances likely to produce death or serious physical injury), (2) "the death was proximately caused by the acts of the defendant," [6] and (3) "but for the defendant's conduct, the death would not have occurred." Millis is correct that some jurors may have concluded he intentionally or knowingly choked the child causing his death, while others may have concluded he intentionally or knowingly inflicted head trauma to cause death. But he was not entitled to a unanimous verdict as to the means of commission of child abuse, nor of first degree murder. *Id.* ¶ 46; *see also Payne,* 233 Ariz. 484, ¶¶ 88, 90, 314 P.3d at 1263–64. Furthermore, the state presented substantial evidence to support all three alternative means of child abuse. *See West,* 238 Ariz. 482, ¶ 30, 362 P.3d at 1059, *citing State v. Forrester,* 134 Ariz. 444, 447, 657 P.2d 432, 435 (1982). No duplicity error occurred.

■ ¶ 25 Millis argues even if child abuse under § 13–3623(A)(1) is a single unified offense, he suffered a duplicitous charge pursuant *State v. Klokic,* 219 Ariz. 241, 196 P.3d 844 (App. 2008), because the state introduced evidence of multiple acts to support the child abuse charge that were not part of the same criminal transaction. In *West,* a recent case also dealing with fatal child abuse pursuant to § 13–3623(A), we considered and rejected this argument. 238 Ariz. 482, ¶¶ 31–39, 362 P.3d at 1059–61. We held the multiple-acts analysis in *Klokic* is generally inapplicable to cases involving a single unified offense such as child abuse under § 13–3623(A). *See West,*

6. The instruction went on to define proximate causation.

238 Ariz. 482, ¶¶ 38–39, 362 P.3d at 1061. Here, as in *West*, the state had little choice but to allege the multiple acts because "it did not know the precise timing and nature of the injury leading to [C.K.'s] death." *Id.* ¶ 45. Moreover, as in *West*, even if the state alleged multiple acts to support the child abuse charge, these acts " 'only caused a single result'—[C.K.'s] death—and were part of a 'single criminal undertaking' " occurring over the course of a single afternoon and evening. *Id.*, *quoting Klokic*, 219 Ariz. 241, ¶ 28, 196 P.3d at 850; *see also Payne*, 233 Ariz. 484, ¶¶ 88, 90, 314 P.3d at 1263–64 (child abuse "only one crime"; jury unanimity not required as to whether offense committed by failing to feed or failing to seek medical attention).

 ¶ 26 Finally, even if a duplicity error had occurred, Millis has not met his burden of showing prejudice. *Henderson*, 210 Ariz. 561, ¶ 20, 115 P.3d at 607. First, as to the child abuse charge, regardless of whether the choking actually caused death, no reasonable juror could have failed to find that Millis knowingly or intentionally choked C.K.[7] *Cf. Payne*, 233 Ariz. 484, ¶ 90, 314 P.3d at 1264 (no reasonable jury could have failed to find defendant guilty of child abuse for failing to seek medical care). Millis repeatedly admitted choking C.K. so that he would stop crying, and the jury reasonably could have concluded that the bruises wrapping around C.K.'s neck were inflicted while Millis alone was watching him. And second, as to the first-degree murder charge, even if some jurors believed the choking Millis admitted was a but-for cause of death, while others believed the choking was not a cause of death but believed Millis knowingly or intentionally inflicted the blunt force trauma and that it caused C.K.'s death, Millis had no right to jury unanimity as to the means of commis-

sion of murder. *See Schad*, 501 U.S. at 631–32, 111 S.Ct. 2491.

## Victim's Use of Facility Dog at Trial

 ¶ 27 Millis argues the trial court denied him due process and a fair trial by allowing a facility dog and its handler to sit beside S.F. during the trial. In keeping with the trial court's "broad discretion" in managing trial conduct, *State v. Cornell*, 179 Ariz. 314, 332, 878 P.2d 1352, 1370 (1994), this court will not disturb a trial court's ruling regarding the use of a facility dog absent an abuse of discretion, *see State v. Dye*, 178 Wash.2d 541, 309 P.3d 1192, ¶¶ 14–15, 19, 32 (2013) (en banc) (ruling allowing facility dog to accompany witness reviewed for abuse of discretion).

¶ 28 Following S.F.'s appearance at various pretrial hearings accompanied by a facility dog named "Blake," Millis brought a motion in limine to preclude Blake's presence at trial. He argued Arizona crime-victim law gives a victim a right to be accompanied by a support person, not a support animal, and that the dog would unfairly prejudice him by inviting the jury to base its decision on emotion or sympathy. The state argued Blake would not prejudice Millis, and would help S.F. testify in the midst of difficult circumstances. After a hearing, the trial court found that the dog's presence would not unfairly prejudice Millis. Although the judge expressed a personal preference that Blake not be present, she saw no "legal basis" to exclude the dog and denied the motion. Millis moved for reconsideration, and the court denied that motion as well.[8] Blake did not accompany S.F. while she testified, but only while she sat in the gallery.

 ¶ 29 The state argues we should review the due process aspect of Millis's claim for fundamental error, citing *Henderson*, 210 Ariz. 561, ¶¶ 19–20, 115 P.3d at 607–08. But

---

7. The knowing or intentional mens rea for child abuse under § 13-3623(A)(1) applies only to the defendant's actions, not to the "under circumstances likely to produce death or serious physical injury" prong. *See Payne*, 233 Ariz. 484, ¶¶ 69–71, 314 P.3d at 1260–61.

8. In his motion for reconsideration, Millis argued in the alternative that he too should be allowed to have a dog with him during trial as a matter of equal protection. The state did not oppose Millis's request, but when the trial court asked Millis if having a dog with him at trial would actually comfort him, he said he did not think so and he did not need one. The court then denied Millis's request. He does not challenge this ruling on appeal, nor does he raise an equal protection argument.

Millis objected to Blake's presence at trial in his motion in limine, and argued repeatedly that the dog would unfairly prejudice the jury against him. His motion and argument were sufficient to present the issue of trial fairness to the trial court, even if he never invoked the words "due process" or "fair trial." *See State v. Foshay*, 239 Ariz. 271, ¶¶ 27–28, 370 P.3d 618, 624 (App. 2016). Accordingly, we review for harmless error. *See Henderson*, 210 Ariz. 561, ¶ 18, 115 P.3d at 607 (harmless error review places burden on state to prove beyond reasonable doubt error did not contribute to or affect verdict or sentence).

 ¶ 30 As Millis observed in his motion in limine, Rule 39(b), Ariz. R. Crim. P., gives a crime victim[9] the right to be accompanied at interviews, depositions, and court proceedings by a parent, relative, or other "appropriate support *person*," Ariz. R. Crim. P. 39(b)(8)–(9) (emphasis added), but is silent about whether the victim may be accompanied by a support animal. At the time of Millis's trial, no Arizona statute discussed the use of a facility dog in the courtroom. Nor is there any Arizona case law on the subject.

¶ 31 Several other states, however, have considered the question and at least five have approved the use of dogs to accompany witnesses under appropriate circumstances. *See People v. Chenault*, 227 Cal.App.4th 1503, 175 Cal.Rptr.3d 1, 9–12 (2014); *People v. Spence*, 212 Cal.App.4th 478, 151 Cal.Rptr.3d 374, 404–06 (2012); *State v. Devon D.*, 321 Conn. 656, 138 A.3d 849, 864–67 (2016); *People v. Tohom*, 109 A.D.3d 253, 969 N.Y.S.2d 123, 131–37 (2013); *State v. Jacobs*, 2015-Ohio-4353, ¶¶ 19–28, 2015 WL 6180908 (Ohio Ct. App. Oct. 21, 2015); *Dye*, 309 P.3d 1192, ¶¶ 17–32.[10]

¶ 32 Millis first asserts that a dog accompanying a victim is "presumptively prejudi-

cial" so as to jeopardize a fair trial in every case, and contends it "present[s] a nonevidentiary message" to the jury that the witness is an innocent victim. Other courts have rejected these arguments, as do we. *See Chenault*, 175 Cal.Rptr.3d at 10 (support dog not inherently prejudicial, just as support person not inherently prejudicial); *Tohom*, 969 N.Y.S.2d at 134 (no prejudice from "the concededly unobtrusive presence of the dog in the courtroom"). Since the time of Millis's trial, our own legislature has endorsed the use of facility dogs in certain circumstances. Section 13–4442, A.R.S., which came into effect after Millis filed his opening brief in this appeal, governs the use of such dogs for crime victims testifying in court. Among other things, it gives the court discretion to allow an adult crime victim to be accompanied by a dog.[11] § 13–4442(B). Although § 13–4442 was not in effect at the time of Millis's trial, it shows the policy of the State of Arizona to accommodate crime victims' use of a dog. *See Taylor v. Graham Cty. Chamber of Commerce*, 201 Ariz. 184, ¶ 27, 33 P.3d 518, 525 (App. 2001) ("[W]hen … the legislature has clearly spoken on a matter within its domain, its word constitutes public policy on that subject and controls, assuming no constitutional impediments exist."). Moreover, there is no indication that this policy contaminates a fair trial in every case. *Cf. Dye*, 309 P.3d 1192, ¶¶ 29–30 (no indication in record that facility dog actually engaged in any prejudicial behavior; court would not "speculate about what *might* have happened at trial").

¶ 33 Millis further argues the trial court failed to inquire into and weigh the appropriate factors to determine whether a facility dog was appropriate in this particular case and for this particular victim, in an abdication of its role in exercising discretion. *See State v. Garza*, 192 Ariz. 171, ¶ 16, 962 P.2d 898, 902 (1998) (failure to exercise discretion

---

9. It is undisputed that S.F., as C.K.'s mother, is a "victim" under Arizona law. Ariz. Const. art. II, § 2.1(C); A.R.S. § 13–4401(19); Ariz. R. Crim. P. 39(a)(1).

10. *Dye* involved a developmentally disabled adult victim with an IQ of 65 and a mental age ranging from six to twelve years old who was "very scared" to testify about burglaries of his home. 309 P.3d 1192, ¶¶ 2–6, 9–10, 26. All of the other

cases cited involved minor victims testifying about sexual abuse.

11. The statute also requires a jury instruction in cases involving a facility dog, in order "[t]o ensure that the presence of [the] facility dog … does not influence the jury or is not a reflection on the truthfulness of any testimony" the witness offers. § 13–4442(C).

may constitute abuse of discretion). He notes that other jurisdictions typically allow facility dogs for children or developmentally disabled adult witnesses whose testimony might otherwise be unavailable, and argues the state made no particularized showing of why S.F.—an adult with no apparent disability— needed one. However, the record indicates that the court considered factors relevant to its discretionary balancing of potential benefits and potential prejudices from a dog. For instance, the court was informed that Blake would not accompany S.F. at the witness stand, but would only sit with her in the gallery. This supports the court's finding that the use of the dog would not unfairly prejudice Millis, because the animal would have been less visible and prominent to the jury in the gallery than it would have at the witness stand. *Cf. Devon D.*, 138 A.3d at 863 (trial court approved presence of dog at witness stand but ordered that dog be placed such that jury would not see it). The trial court also implicitly found that Blake would help prevent undue stress for S.F. during a difficult trial about the death of her infant son.[12] *See* Ariz. R. Evid. 611(a)(3). The court did not abandon its duty to exercise discretion, nor did it abuse its discretion.

## Disposition

¶ 34 We affirm Millis's convictions and sentences for the reasons stated above.

---

12. The factors the trial court considered in exercising its discretion in this case are not the only factors a court may properly consider in determining whether to allow witness accommodations, nor are they necessary considerations in every case.