NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

LILLIAN MARGUERITE HESTER, *Appellant.*

No. 1 CA-CR 18-0770
FILED 12-24-2019

Appeal from the Superior Court in Coconino County
No. S0300CR201600433
The Honorable Dan R. Slayton, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

White Law Offices, PLLC, Flagstaff
By Wendy F. White
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge James B. Morse Jr. joined.

---

**J O H N S E N**, Judge:

¶1        Lillian Marguerite Hester appeals her convictions and sentences for first-degree murder and child abuse. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2        We view the facts in the light most favorable to sustaining the verdicts and resolve all inferences against Hester. *State v. Gurrola*, 219 Ariz. 438, 439, ¶ 2, n.1 (App. 2008). Hester acquired custody of J.H., her sister's son, immediately after he was born in January 2009. When he died at the age of six, an autopsy revealed significant neglect and injuries, leading a forensic pathologist specializing in child deaths to conclude his death was caused by battered-child syndrome.

¶3        A grand jury charged Hester with child abuse, a Class 2 felony and dangerous crime against children, and first-degree murder, a Class 1 felony. Following trial, a jury convicted Hester as charged. The superior court sentenced Hester to 17 years' imprisonment on the child-abuse conviction and a consecutive term of imprisonment for natural life on the first-degree murder conviction. Hester timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2019), 13-4031 (2019), and -4033(A)(1) (2019).[1]

## DISCUSSION

**A.      The Jury Instructions.**

¶4        On appeal, Hester argues the superior court erred by failing to properly instruct the jury on first-degree murder and child abuse. Because Hester did not object to the instructions and failed to request

---

[1]        Absent material revision after the date of an alleged offense, we cite the current version of a statute or rule.

different instructions at trial, we review for fundamental, prejudicial error. *State v. Escalante*, 245 Ariz. 135, 138, ¶ 1 (2018).

¶5 To prevail on fundamental-error review, a defendant must first show trial error. *Id.* at 142, ¶ 21. If trial error occurred, we then determine, based on the totality of the circumstances, whether it was fundamental and prejudicial. *Id.* To establish fundamental error, a defendant must show the error: (1) went to the foundation of the case, (2) took away a right essential to the defense or (3) was so egregious that the defendant could not possibly have received a fair trial. *Id*. "If the defendant establishes fundamental error under prongs one or two, [the defendant] must make a separate showing of prejudice." *Id.* We presume jurors follow their instructions. *State v. Prince*, 226 Ariz. 516, 537, ¶ 80 (2011).

### 1. First-degree murder instruction.

¶6 Hester was charged with first-degree murder under A.R.S. § 13-1105(A)(2) (2019), Arizona's felony-murder statute. The predicate felony for the murder charge was intentional or knowing child abuse under A.R.S. § 13-3623(A)(1) (2019).

¶7 The superior court correctly instructed the jury, in accordance with the statute and the Revised Arizona Jury Instructions ("RAJI"), that the State needed to prove that (1) Hester committed or attempted to commit child abuse, and (2) in the course of and in furtherance of this crime, she caused the death of any person. *See* A.R.S. § 13-1105(A)(2); RAJI Stand. Crim. 11.052 (5th ed. 2019). The court also properly instructed the jury that the charge required "no specific mental state other than what is required for the commission of child abuse," as provided in § 13-1105(B).

¶8 Hester suggests fundamental error occurred because the superior court did not also specifically instruct the jury that felony murder by the commission of child abuse requires that the child abuse be committed intentionally or knowingly. Hester further argues the instructions the court gave for the lesser-included child-abuse offenses (i.e., reckless and negligent mental states under § 13-3623(A)(2) and (3)) created the possibility of jury confusion.

¶9 Hester's arguments are unfounded. The jury found her guilty of intentional or knowing child abuse, and, as instructed, it did not consider or return verdicts on the lesser-included offenses. Although the court did not give an explicit additional instruction informing the jurors that felony murder by child abuse required an intentional or knowing mental state, the verdict form for first-degree murder instructed the jurors that they were to

return a verdict for that offense "only if you [the jury] find the defendant guilty of Child Abuse – Intentional or Knowing" and that they were precluded from returning a verdict for the charge otherwise. The same constraint was stated on the verdict forms for child abuse and was pronounced when the verdict was read.[2] "We evaluate jury instructions and verdict forms as a whole to determine whether they correctly stated the law, allowed the jury to understand the issues, and provided the jury with the correct rules for reaching a decision." *Lohmeier v. Hammer*, 214 Ariz. 57, 61, ¶ 13 (App. 2006); *see also State v. Payne*, 233 Ariz. 484, 509, ¶¶ 91-92 (2013) (verdict forms may remedy an alleged deficiency in jury instructions).

**¶10**          The court read the instructions and the verdict forms to the jury. The instructions stated the jury could consider the lesser-included offenses of reckless or negligent child abuse only if it found Hester not guilty of intentional or knowing child abuse or if it could not agree on a verdict for that crime. Therefore, the jury was fully and correctly instructed, and we presume jurors follow their instructions. *Prince*, 226 Ariz. at 537, ¶ 80. To the extent any potential confusion remained, the prosecutor and Hester's counsel both explained in closing that the jury could find Hester guilty of felony murder only if it found that she committed child abuse intentionally or knowingly. *See State v. Bruggeman*, 161 Ariz. 508, 510 (App. 1989) (appellate courts may consider closing arguments to assess whether jury instructions were adequate).

### 2.    Failure to seek medical care.

**¶11**          Hester next contends the superior court erred by failing to, *sua sponte*, give the jury a definition of "failure to seek medical care" as a purported element of felony murder by child abuse. Citing *State v. Bennett*, 213 Ariz. 562, 567, ¶ 23 (2006), she argues the court erred by not instructing the jury that to prove felony murder by child abuse based on a failure to obtain medical treatment, the State must prove beyond a reasonable doubt that the "[victim's] death 'would not have happened' without [defendant's] delay in seeking medical attention." Hester cites no case authority requiring

---

2          The verdict forms instructed, "If you find the Defendant guilty of Child Abuse – Intentional or Knowing, do not complete the next portion of the verdict form. Complete this portion [lesser-included offense of Child Abuse – Reckless] only if you find the Defendant Not Guilty of Child Abuse – Intentional or Knowing or if you are unable to decide on Child Abuse – Intentional or Knowing."

an instruction defining failure to obtain medical treatment, but summarily argues it is a necessary element of causation in a case such as this.

¶12 Hester's reliance on *Bennett* is unavailing. Here, the superior court properly instructed the jury in accordance with the statutes for felony murder, child abuse and causation. The causation instruction defined both direct and proximate causation. In sum, the instructions correctly instructed that to find Hester guilty, the jury was required to find her intentional or knowing child abuse produced J.H.'s death and "without which the death would not have occurred." Contrary to Hester's suggestion, and to the limited extent the facts in evidence resembled those in *Bennett*, the causation instruction is consistent with the instruction in that case. 213 Ariz. at 567, ¶ 23.

¶13 Moreover, although the State contended that Hester's failure to obtain medical care caused J.H.'s death, it also argued she caused his death by other means. The evidence, discussed *infra* ¶¶ 19-24, also established that Hester's prolonged abuse and neglect of J.H. directly caused battered-child syndrome, resulting in his death. The jury was not required to agree on a single cause of J.H.'s death. *See infra* ¶¶ 33-35; *see also, e.g.*, *Payne*, 233 Ariz. at 508-09, ¶¶ 81, 85, 90. Accordingly, the jury was not required to find that Hester's failure to seek medical care caused J.H.'s death.

B. **Sufficiency of the Evidence.**

¶14 Arguing insufficient evidence supports the convictions, Hester contends the superior court erred by denying her motions for judgment of acquittal and a new trial pursuant to Arizona Rules of Criminal Procedure 20 and 24.1. Because both arguments are based on sufficiency of the evidence, we address them together. *See State v. Neal*, 143 Ariz. 93, 98 (1984).

¶15 A judgment of acquittal is appropriate when "there is no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1). We review *de novo* a superior court's ruling on a Rule 20 motion. *State v. West* (*West II*), 226 Ariz. 559, 562, ¶ 15 (2011). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at ¶ 16 (citation omitted). Substantial evidence is "such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt," and may be direct or circumstantial. *Id.* (quotation

omitted). We test the evidence "against the statutorily required elements of the offense," *State v. Pena*, 209 Ariz. 503, 505, ¶ 8 (App. 2005), and neither reweigh conflicting evidence nor assess the credibility of witnesses, *State v. Buccheri-Bianca*, 233 Ariz. 324, 334, ¶ 38 (App. 2013).

**¶16** We review a superior court's ruling on a motion for new trial based on the weight of the evidence for an abuse of discretion. *State v. Parker*, 231 Ariz. 391, 408, ¶ 74 (2013). "A motion for new trial should be granted only if the evidence was insufficient to support a finding beyond a reasonable doubt that the defendant committed the crime." *Id.* (quotation omitted). When deciding a motion for new trial, the superior court sits as the so-called "thirteenth juror" and may independently weigh the evidence and determine the credibility of the witnesses. *State v. Fischer*, 242 Ariz. 44, 49-50, ¶¶ 14-15, 17 (2017) (citation omitted).

**¶17** Under § 13-3623(A)(1), a person commits child abuse punishable as a dangerous crime against children when, "[u]nder circumstances likely to produce death or serious physical injury," he or she intentionally or knowingly causes a child under fifteen years of age "to suffer physical injury or, having the care or custody of a child . . . causes or permits the person or health of the child . . . to be injured or . . . causes or permits a child . . . to be placed in a situation where the person or health of the child . . . is endangered." *See also* A.R.S. § 13-705(Q)(1)(h) (2019).

**¶18** Initially, we note there was no meaningful dispute at trial concerning the statutory elements of J.H.'s age or whether J.H. was in Hester's care or custody. The State offered the following evidence pertaining to the remaining elements.

**¶19** When J.H. was born, he had no health problems and his weight was average. Hester and her husband, J.T.H., raised the boy along with their four daughters in a rural area in northern Arizona close to Hester's mother. Hester did not enroll J.H. in school with the other children. Hester and J.T.H. eventually separated, and J.T.H. moved to another state in 2013. At the time, J.H. was healthy and active. In September 2014, Hester's boyfriend, J.C., began living with Hester and her family. A few weeks before J.H.'s death, Hester's 12-year-old autistic nephew, D.G., came to stay with the family. D.G. generally slept in the same room as J.H., and did so on the night J.H. died.

**¶20** In the week before J.H.'s death, he had not been eating or sleeping and was behaving erratically. On the night of his death, Hester gave him a generic antihistamine that contained the sleep aid

diphenhydramine. Hester was awakened the next day by the other children screaming that J.H. was not breathing. Hester called 9-1-1 a few minutes later but only after instructing one of her daughters to call Hester's mother, who arrived shortly thereafter. J.H. died from cardiopulmonary arrest before he arrived at the hospital.

¶21 At the time of his death, J.H. was extremely malnourished and dehydrated. He suffered from severe thymic involution (the thymus assists the immune system) due to chronic stress on his body. He had 80-100 external injuries on his body, including cuts, bruises and lacerations. At six-and-a-half years old, and after losing about ten pounds the week before he died, he weighed just 29 pounds, placing him under the third percentile for his age, and he appeared the size of a three-and-a-half- to four-year-old child. No one had taken J.H. to visit a medical-care provider since he was vaccinated in February 2013, when he appeared healthy and of normal size. Photos taken at the time of his death showed J.H.'s poor condition and "purplish-blue" skin coloring. The autopsy and examinations later revealed that several weeks before he died, J.H. had suffered a fracture to his right humerus bone that was never treated and healed on its own at an angle. This type of fracture would be caused only by significant force, such as from a car accident, and would have been extremely painful.

¶22 Hester acknowledged several times that she should have taken J.H. to the doctor. But she did not do so, even though his health deteriorated over an extended period of time, and even though he was in obviously grave condition in his final week. Over all that period, Hester kept J.H. in a highchair during the day and, at night, she locked him in his bedroom, where law enforcement found feces. Hester mainly fed J.H. only dry cornflakes, and, even at six years old, he was not allowed to leave his highchair until he finished them. To punish J.H. when he did not eat the dry-cornflake meals, Hester refused him water. J.H. was so frail and weak that he needed help walking. Hester would spank him almost daily, often with a belt, and would make him march in place beside his highchair for exercise. A few days before J.H.'s death, Hester texted with a friend about her desire to be rid of J.H., and the two discussed that if Hester could locate her sister, J.H. could be shipped off to her in a "live animal box."

¶23 The medical examiner was not able to identify a natural cause of J.H.'s death but found significant signs of neglect and did not rule out battered-child syndrome. He also found dehydration but could not diagnose malnourishment because of the absence of prior medical records for J.H.

¶24          The State's medical expert, a forensic pathologist who had access to extensive medical records and interviews, testified that J.H.'s death was caused by battered-child syndrome. Specifically, the expert testified J.H.'s death was produced by overt acts of abuse and prolonged neglect that together were more than sufficient to meet the syndrome's clinical definition, all of which J.H. suffered inside Hester's home and under her care. The expert testified the autopsy was one of the most thorough he had reviewed and that the medical examiner did every conceivable test to rule out alternative or natural causes of J.H.'s death. To reach his diagnosis of battered-child syndrome and his opinion that it caused J.H.'s death, the expert considered the nature and extent of J.H.'s injuries; J.H.'s overall appearance and condition; his level of malnutrition and dehydration; his small size and extensive weight loss; his severe thymic involution; Hester's refusal to obtain medical care; the healed fracture of J.H.'s right humerus, which would have been painful, debilitating and obvious; evidence of J.H.'s failure to thrive; and the absence of an identifiable natural cause for these conditions or his death. Both the medical examiner and the State's expert agreed that the deprivation of food and the deprivation of water that the child suffered were separately life-threatening, and the State's expert stated the combination of those two made the threat even more concerning.

¶25          At trial, Hester's defense was, first, that she was not guilty of intentionally or knowingly committing acts of child abuse. Hester also presented a third-party-culpability defense, arguing that D.G., the autistic child who was sleeping in the same room, was responsible for J.H.'s death. Through the testimony of Hester's daughters, S.H., A.H. and T.H., Hester asserted that D.G. attacked and strangled J.H., causing or contributing to his death. On appeal, Hester argues that an alleged intervening event by D.G. prevented the State from proving causation.

¶26          D.G. denied the allegations at trial, testifying that although he had physical encounters with J.H. at other times, he did not touch J.H. on the night of his death. A.H. testified she saw D.G. with his hands around J.H.'s neck the night before J.H. died and she needed to separate them. A.H. did not mention this incident, however, in her two interviews with law enforcement after J.H.'s death.

¶27          S.H. testified that A.H. instructed her to "lie" and report to law enforcement that D.G. had suffocated J.H. T.H. claimed that she had seem D.G. choking J.H. a "week or two" before J.H.'s death but failed to report this alleged incident until a third interview with authorities. At trial, T.H. disclosed for the first time an assertion that D.G. told her "I didn't mean to kill [J.H.]"

¶28        Beyond D.G.'s denial, the jury reasonably could have found significant credibility issues in Hester's daughters' testimony. Furthermore, neither the medical examiner nor the State's expert saw any objective evidence of strangulation. The State's expert in particular was provided with specific, detailed information concerning the allegations against D.G., considered them in his review and rejected them.

¶29        At the same time, the evidence offered by the State showed that Hester's abuse and neglect resulted in battered-child syndrome that caused J.H.'s death. *See State v. Hernandez*, 167 Ariz. 236, 239 (App. 1990) (collecting cases upholding admission of battered-child-syndrome evidence, including to prove cause of death); *State v. Poehnelt*, 150 Ariz. 136, 139, 150 (App. 1985) (no error in permitting expert to testify about battered-child syndrome in child-abuse case even though it pertained to the ultimate issue). The jury was free to accept that evidence over Hester's evidence and argument to the contrary. *See State v. Clemons*, 110 Ariz. 555, 556-57 (1974).

¶30        The evidence also supported the jury's finding that Hester intentionally or knowingly caused J.H.'s obvious life-threatening condition through overt acts of abuse and long-term neglect, which the State's expert termed battered-child syndrome, and that this directly and proximately caused J.H.'s death. In addition, the evidence was sufficient to show that Hester's intentional or knowing failure to obtain medical care for J.H. also caused his death. Hester acknowledged she should have sought medical help for J.H.; the jury might have concluded she did not because she feared the legal consequences she would suffer if doctors saw his grave condition. *See Payne*, 233 Ariz. at 507, ¶ 77.

¶31        Connecting the facts to the statutory elements of the offense, the evidence substantially shows Hester committed child abuse by "caus[ing]" (overt acts of abuse including physical injury) and "permit[ting]" (significant neglect over an extended period of time) J.H.'s person and health to be injured and by placing him in a situation (her home under her care) where his person and health were endangered, eventually causing his death. *See* A.R.S. § 13-3623(A). We therefore conclude the State offered sufficient evidence to prove each of the three alternative means provided in the child-abuse statute. *See infra* ¶¶ 33-35. As such, we decline the State's invitation on appeal to determine whether the jury was required to agree on the specific means by which Hester committed the crime. For these reasons, the superior court did not err by denying Hester's Rule 20 and Rule 24.1 motions.

## C.    Duplicity of the Charges.

**¶32**        Hester argues the charges were duplicitous and violated her right to a unanimous jury verdict.   In her brief, Hester focuses her duplicitous argument only on the child-abuse charge.  *See State v. Moody*, 208 Ariz. 424, 452, ¶ 101, n.9 (2004) (failure to adequately argue claim in opening brief usually constitutes waiver).  Because Hester did not complain about duplicity in the superior court, we review for fundamental, prejudicial error.  *Escalante*, 245 Ariz. at 138, ¶ 1.  A criminal defendant is entitled to a unanimous jury verdict, and violation of that right constitutes fundamental error.  Ariz. Const. art. 2, § 23; *State v. Davis*, 206 Ariz. 377, 390, ¶ 64 (2003).

**¶33**        We have defined § 13-3623(A) as "an alternative-means statute," meaning that the crime of child abuse is "a single unified offense." *State v. West* (*West III*), 238 Ariz. 482, 489, ¶ 19 (App. 2015).  "Alternative means statutes identify a single crime and provide more than one means of committing the crime."  *Id.* (citation omitted).  Specifically, a person may commit child abuse by three different means, and the statute classifies the offense based on the defendant's mental state.  *Id.* at 490, ¶¶ 21-22.  Because child abuse is a single unified offense, "the same evidence can be used to prove all three means."  *Id.* at 492, ¶ 28.  First-degree murder also is a single unified offense, and thus jury unanimity concerning the means of death is not required.  *State v. Millis*, 242 Ariz. 33, 40, ¶ 22 (App. 2017).

**¶34**        Thus, a defendant charged with child abuse is entitled to a unanimous verdict regarding whether the defendant committed the offense but is not entitled to unanimity regarding the precise manner in which the offense was committed.  *Payne*, 233 Ariz. at 508-09, ¶¶ 81-90; *Millis*, 242 Ariz. at 39-40, ¶ 21; *West III*, 238 Ariz. at 492-94, ¶¶ 29-30, 37.  A jury may reach a verdict regarding a single unified offense "based on a combination of alternative findings."  *State v. Dann*, 220 Ariz. 351, 367, ¶ 79 (2009).

**¶35**        Relying on *State v. Klokic*, 219 Ariz. 241, 244, ¶ 14 (App. 2008), however,  Hester argues the State was required to elect a particular act upon which to base a conviction or, alternatively, the court was obligated to instruct jurors that they all must agree on a specific act to support any guilty verdict.  The measures described in *Klokic*, however, do not apply here because the "multiple-acts analysis in *Klokic* is generally inapplicable to cases involving a single unified offense such as child abuse under § 13-3623(A)."  *Millis*, 242 Ariz. at 40-41, ¶ 25; *see West III*, 238 Ariz. at 493-94, 496, ¶¶ 37-39, 46.  Here, the indictment alleged Hester engaged in an ongoing course of criminal conduct over an extended period of time as a single

undertaking under alternative-means statutes. It thus clearly informed her the child-abuse charge was based on her continuing course of conduct from October 1, 2014, to June 22, 2015. For that reason, the State did not need to elect a specific act upon which to proceed, and the court was not required to give a unanimity instruction. *State v. Sanders*, 245 Ariz. 113, 130, ¶¶ 70-72 (2018); *Millis*, 242 Ariz. at 40, ¶ 24; *West III*, 238 Ariz. at 494, ¶ 39. As in *Millis* and *West III*, the extended continuing course of Hester's criminal acts and failures to act, such as denying food and water and refusing to seek medical care, made it impossible to determine the exact time and nature of each act of abuse, and ultimately caused a single result: J.H.'s death. *Millis*, 242 Ariz. at 40, ¶¶ 24-25; *West III*, 238 Ariz. at 496, ¶ 45.

¶36 In any event, even under a *Klokic* multiple-acts analysis, the remedial measures would not be required because Hester's abuse and neglect were part of a single criminal transaction. *See Payne*, 233 Ariz. at 508, ¶¶ 85-86; *West III*, 238 Ariz. at 494-95, ¶ 40; *Klokic*, 219 Ariz. at 244, ¶¶ 14-15. Moreover, she offered the same defenses to the charged acts, asserting that any neglect or acts were not intentional or knowing and that the third-party culpability of D.G. was an intervening causal event. *See Sanders*, 245 Ariz. at 130, ¶ 72.

¶37 In sum, the charges were not duplicitous and Hester's right to a unanimous jury verdict was not violated.

**D.   Asserted Vagueness of the Child-Abuse Statute.**

¶38 Hester argues the child-abuse statute, § 13-3623, is unconstitutionally vague because it fails to give reasonable notice of the acts it prohibits and therefore permits arbitrary enforcement. Because Hester did not raise this issue in the superior court, we review for fundamental, prejudicial error. *Escalante*, 245 Ariz. at 138, ¶ 1.

¶39 "A statute is void for vagueness if it fails to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that [the person] may act accordingly." *State v. Burbey*, 243 Ariz. 145, 149, ¶ 15 (2017) (quotation omitted). Yet, "with the exception of challenges based on First Amendment grounds, a defendant whose conduct clearly falls within the legitimate purview of the statute has no standing to challenge the statute as vague." *State v. Anderson*, 199 Ariz. 187, 191, ¶ 15 (App. 2000); *see also State v. George*, 233 Ariz. 400, 402, ¶ 8 (App. 2013) (rejecting vagueness challenge because defendant's "conduct fell squarely within the statute's ambit").

¶40        Here, Hester was convicted based on acts that fell squarely within the statute's proscriptions, such as denying J.H. food and water to the point he was dehydrated and severely underweight, excessively punishing him, and refusing to obtain medical care for him when he was obviously critically ill. *See* A.R.S. § 13-3623(A), (F)(4). Thus, her vagueness challenge fails.

## E.        Hester's Motion for Mistrial.

¶41        Hester argues the superior court erred by denying her motion for mistrial. We review the denial of a motion for mistrial for an abuse of discretion. *State v. Jones*, 197 Ariz. 290, 304, ¶ 32 (2000). "A declaration of a mistrial is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson*, 136 Ariz. 250, 262 (1983). Hester also contends for the first time on appeal that prosecutorial misconduct occurred in the events that led to the motion; we review that argument for fundamental, prejudicial error. *Escalante*, 245 Ariz. at 138, ¶ 1.

¶42        To determine whether a prosecutor's comments "constituted misconduct that warrants a mistrial, a trial court should consider two factors: (1) whether the prosecutor's statements called to the jury's attention matters it should not have considered in reaching its decision and (2) the probability that the jurors were in fact influenced by the remarks." *State v. Newell*, 212 Ariz. 389, 402, ¶ 60 (2006). The defendant bears the burden of showing the challenged statements, "in the context of the entire proceeding, so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quotation omitted).

¶43        During cross-examination, Hester had asked D.G. about his relationship with J.H., and D.G. volunteered he had anger problems while he was living at Hester's home but said he thereafter rectified those problems. On redirect, the State asked D.G. whether he had any problems controlling himself in stressful situations, and then asked, "Does that go along with the fact that you've been diagnosed autistic?" Earlier, the court had precluded cross-examination about D.G.'s condition and any medications for it.

¶44        Hester's counsel objected before D.G. answered. Hester moved for a mistrial, arguing Hester had been prejudiced beyond rehabilitation because her cross of D.G. was exhausted and that due to D.G.'s condition, her lawyer could not restore the rapport he had previously

built with D.G. The superior court expressed concern about the prosecutor's question but denied the motion. Hester accepted the court's offer to strike the question and instruct the jury to disregard it.

¶45 The superior court did not err in concluding the question did not require a mistrial. Although the question approached a precluded subject area, D.G. did not respond to it, and the State was not allowed to ask other questions about D.G.'s condition. Considering the context, D.G.'s overall testimony and D.G.'s previous statement that he had anger problems during the time he lived in Hester's home, we cannot conclude the question influenced the jury, and, in any event, any implication that D.G. had uncontrolled anger problems seemingly would have buttressed Hester's defense that D.G. attacked J.H. Moreover, the court's remedy was appropriately tailored to the violation. Again, we presume jurors follow the court's instructions. *Prince*, 226 Ariz. at 537, ¶ 80.

¶46 In addition, the superior court altered its prior ruling by allowing Hester to ask D.G. about the medications and his condition, but Hester chose not to inquire about those subjects in further cross-examination. For all these reasons, the court did not abuse its discretion by denying Hester's motion for mistrial.

¶47 Regarding Hester's prosecutorial-misconduct argument, the prosecutor's question, though apparently improper, was not misconduct. The question was at least tangentially related to D.G.'s earlier testimony that he had received help for his anger. Moreover, the record contains no mention of prosecutorial misconduct related to the incident, and the court did not appear to reject the prosecutor's explanation for why he asked the question. The record thus does not support Hester's argument.

## F. The Superior Court's Evidentiary Rulings.

¶48 Hester argues the superior court erred by denying her request to admit a video-recorded interview of D.G. and by limiting her cross-examination of D.G. We review the superior court's evidentiary rulings for an abuse of discretion. *State v. Delahanty*, 226 Ariz. 502, 506, ¶ 17 (2011) (cross-examination); *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006) (generally). We review questions of law *de novo*. *See State v. Davolt*, 207 Ariz. 191, 202, ¶ 21 (2004).

### 1. Videotaped interview of D.G.

¶49 During direct examination of D.G., the State needed to refresh his memory numerous times. Before cross-examination, to support her

third-party-culpability defense, Hester moved to admit an entire 45-minute interview of D.G. recorded the day after J.H.'s death at a "Safe Child" facility. She argued the videotape was admissible both as a past recollection recorded under Arizona Rule of Evidence 803(5)(A) and as non-hearsay offered to show D.G.'s demeanor. The court ruled that although D.G.'s memory lapses about certain topics had been successfully refreshed during direct examination, those lapses were an insufficient basis on which to admit the entire video. The court, however, allowed Hester to use any relevant portion of the interview to refresh D.G.'s recollection or impeach him if needed. During cross-examination, Hester used several interview transcripts, including that of the Safe Child interview, but not the video.

¶50        The record supports the superior court's ruling. The court properly addressed the foundational requirements under Rule 803(5)(A), which specifically requires memory loss on a particular matter: The record must be "on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately."[3]  Because D.G.'s testimony showed he could testify fully from memory at times and that his memory could be refreshed, the court did not abuse its discretion in its ruling.

¶51        The superior court also concluded D.G.'s demeanor during the interview was not relevant. Hester did not sufficiently demonstrate at trial why D.G.'s demeanor was relevant and fails to do so on appeal. The superior court noted that if Hester chose to play admissible portions of the videotape to refresh D.G.'s memory or impeach him, those excerpts would show D.G.'s demeanor at the time. Finally, because the trial exhibit containing the video is not part of the record on appeal, we presume it supports the superior court's decision. *State v. Mendoza*, 181 Ariz. 472, 474 (App. 1995).

      **2.      Cross-examination of D.G.**

¶52        Hester also contends the court erred when it precluded her from examining D.G. about his character pertaining to violence, including his autism diagnosis, whether D.G. was presently taking autism medications and whether he was taking medications at the time of J.H.'s death.

---

[3]      The superior court further concluded that playing the video in its entirety might introduce irrelevant and overly prejudicial information. *See* Ariz. R. Evid. 402, 403.

¶53        We do not find in the record any offer of proof or other support regarding the relevance of D.G.'s medications or his condition. Consequently, we cannot review the superior court's ruling. *See State v. Hernandez*, 232 Ariz. 313, 321, ¶ 37 (2013) ("The lack of an offer of proof forecloses [appellant's] argument on appeal."). Without record support, we cannot assume that D.G.'s asserted failure to take his medications caused his admitted anger problems, that any current medications remedied those problems, or that the medications or anger were related to his condition.

¶54        Moreover, Hester's reliance on *State v. Machado*, 226 Ariz. 281 (2011), is inapposite. The superior court here did not restrict Hester's third-party-culpability defense based on an improper analysis under Arizona Rule of Evidence 404(b) regarding a past history of violence by the third-party as discussed in *Machado*. 226 Ariz. at 282, 284, ¶¶ 7, 16. The court merely precluded Hester from inquiring during her initial cross-examination of D.G. about his medications and his autism, on the grounds of relevance and prejudice, after D.G. volunteered he previously had anger problems. To the extent this evidence implicated a *Machado* analysis, the superior court's ruling is consistent with *Machado*. *See id.* at 284, ¶ 16 (admission of third-party-culpability evidence governed by Rules 401 through 403, not 404(b)).

¶55        The superior court's only prior limitation on Hester's cross-examination pertaining to D.G.'s alleged past acts of violence was that it instructed counsel to approach the bench before beginning to inquire into any acts to which D.G. "open[ed] the door" so that the court could rule on admissibility. And the superior court permitted Hester to reopen her cross-examination to ask D.G. about his medications and autism diagnosis, but Hester chose not to do so. Thus, the court did not abuse its discretion.

¶56        Finally, although Hester argues the court's limitation of her cross-examination violated due process, because no error occurred, Hester

has not satisfied her initial burden to establish fundamental error.  *See Escalante*, 245 Ariz. at 142, ¶ 21.

## CONCLUSION

**¶57**        For the reasons stated, we affirm Hester's convictions and sentences.

