Filed 10/25/22

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>JAIME GARCIA PICAZO,<br><br>    Defendant and Appellant. | A161621<br><br>(San Mateo County<br>Super. Ct. No. SF387869A) |

Defendant Jaime Picazo was convicted of multiple sexual offenses against children and possession of child pornography. He contends the trial court erred in permitting the two victims to be accompanied by a support dog while testifying, admitting evidence of uncharged acts, and allowing expert testimony on child sexual abuse accommodation syndrome. He further argues that resentencing is required because the trial court imposed an upper term sentence that is invalid under amendments to Penal Code section 1170 that became effective subsequent to his sentencing; that imposition of certain fees and a restitution fine without a determination of ability to pay violated his constitutional rights; and that an order for payment of victim restitution to the Daly City Police Department must be stricken from the abstract of judgment. We agree that the matter must be remanded for resentencing and

---

    * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II. through VI.

1

the abstract of judgment must be corrected, and otherwise affirm the judgment.

## STATEMENT OF THE CASE

An amended information filed on September 28, 2020, charged Picazo with six offenses against B. Doe: four counts of lewd acts upon a child under age 14 (Pen. Code, § 288, subd. (a)),[1] committed between August 27, 2000, and August 26, 2001 (counts 1–4);[2] sexual penetration by a foreign object on a child under age 14 (§ 289, subd. (h)), committed between September 1, 2011, and December 31, 2011 (count 5); and oral copulation of a child under age 18 (§ 288a, subd. (b)(1)), committed between September 1, 2011, and December 31, 2011 (count 6). The amended information charged 10 counts involving A. Doe, all committed between January 4, 2011, and January 3, 2012: nine counts of lewd acts upon a child under age 14 (§ 288, subd. (a)) (counts 7–13, 15, 16),[3] and one count of forcible lewd act upon a child under age 14 (§ 288, subd. (b)(1)) (count 14). The amended information charged one count involving M. Doe, lewd act upon a child then 14 or 15 years old (§ 288, subd. (c)(1)), committed between March 19, 2010, and March 18, 2012 (count 17), and one count of possession of child pornography (§ 311.11, subd. (a)),

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

[2] Specifically, these counts alleged lewd acts consisting of "touch vagina the first time," "touch vagina the second time," "victim touched defendant's penis the first time" and "victim touched defendant's penis a second time."

[3] The specific alleged acts were "touch leg with M. Doe" (count 7), "touch stomach with M. Doe" (count 8), "touch breast the first time" (count 9), "touching breast the last time (count 10), "touch vagina the first time" (count 11), "touch vagina the last time" (count 12), "insert finger in vagina" (count 13), "touch legs" (count 14), "touching buttocks the first time" (count 15), and "touch buttocks the last time" (count 16).

committed on or about March 13, 2013 (count 18). Enhancement allegations of substantial sexual conduct (§ 1203.066, subd. (a)(8)) were alleged as to counts 1 through 4, and 11 through 13. Enhancement allegations for committing a specified offense against more than one victim (§ 667.61, subd. (j)(2)) were alleged as to counts 7 through 16.

During trial, count 14 was changed from a violation of section 288, subdivision (b)(1), to a violation of section 288, subdivision (a), and counts 10, 12, 13, and 17 were dismissed for insufficient evidence.

The jury found Picazo guilty as charged, and the enhancement allegations true, as to counts 1 through 8, 14 through 16, and 18. The jury could not reach verdicts as to counts 9 and 11; the trial court declared a mistrial on those counts and they were subsequently dismissed.

On December 4, 2020, the trial court sentenced Picazo to a determinate prison term of 10 years eight months consecutive to an indeterminate term of 50 years to life. The determinate sentence consisted of the upper term of eight years on count 1; consecutive one-third middle terms of two years on count 3 and eight months on count 5; and concurrent middle terms of six years on counts 2 and 4 and two years on counts 6 and 18. The indeterminate term was composed of consecutive terms of 25 years to life on counts 7 and 15 and concurrent terms of 25 years to life on counts 8, 14, and 16.

Picazo was ordered to pay a $300 restitution fine (§ 1202.4, subd. (b)), a $300 parole revocation fee, suspended unless parole is revoked (§ 1202.45), $400 in court security fees (§ 1465.8), $300 in criminal conviction assessments (Gov. Code, § 70373), and $700 to the Daly City Police Department for the forensic examination at the Keller Center.

STATEMENT OF FACTS

*Molestation of B. Doe*

B. Doe was five years old and her sister A. Doe was two and a half years old when they and their mother, Margarita, moved into a house in San Francisco to live with Margarita's sister, A.R., and A.R.'s husband, Picazo.[4]  A.R.'s son, Alexander, and Picazo's two sons, also lived at the house, as did various other relatives.  Margarita testified that she worked a lot, and A.R. and Picazo would watch B. Doe and A. Doe.  After a year and a half, Margarita and her children moved to another house in San Francisco with A.R., Picazo, and their children, then they all moved to Daly City.  At some point, A.R. and Picazo moved to a separate house in Daly City.  Margarita testified that when B. Doe was about 16 and A. Doe 13, they went to live with A.R. and Picazo because they liked being with their cousins.

B. Doe, who was 25 years old at the time of trial, testified that when they were living in the first house in San Francisco, Picazo was the only one there with the children while the other adults were at work.  Picazo would tell B. Doe to "come cuddle in bed with him" and would put his hand under her clothing on the lips of her vagina and rub in a circular motion while putting her hand on his penis, under his clothing.  This happened "definitely more than five times" when B. Doe was six years old.

B. Doe testified that she lived at Picazo's second house in Daly City because her parents were "going through issues" at the time, and she liked being with her cousins, sister, and a friend, M. Doe, who lived in a downstairs unit.  Picazo would take B. Doe, A. Doe, and M. Doe to restaurants and give them "weed," marijuana cookies, pills, and cocaine.  Picazo said things that

---

[4] We use family members' first names to avoid confusion and protect privacy.  No disrespect is intended.

made B. Doe uncomfortable "all the time": "[L]iterally all he talked about was sex . . . the way he liked it, what he liked to do. He would talk about porn. He would just talk about sex. It was gross."

When B. Doe was 16, she was struggling with her sexuality, dating a girl and unsure whether she liked "girls" or "guys." Picazo brought her into his bedroom, had her sit in front of his computer, and told her, "[I]f you want to find out if you're a real lesbian or not, I can help you out with that. You know I studied psychology before. I'm an expert in these things." B. Doe thought she should trust Picazo because he was her uncle. Picazo gave her a vibrator and put it near her vagina, over her clothes, put lesbian pornography on the computer and sat behind her watching, then reached under her shirt and groped her breast. He kept telling B. Doe she could touch herself with the vibrator. She said she had to do something and left the room, and he said "Yeah, sure we can pick this up another day, you know, we're not quite done with the test."

For the second part of the "test," Picazo again had B. Doe sit in front of the computer and watch pornography. She was excited to find out whether she was "really lesbian" and thought, "he knows what he's doing, let's see. He's a psychologist." She began to get a bit scared when he had her lie down on his bed, take off her pants, and hold the vibrator to her vagina, telling her, "This is part of the test." B. Doe was "mad that [she] had let [her]self get to that point," but did not want to make a scene. Picazo took off B. Doe's underwear and put his finger in her anus and wiggled it. He then told her to turn around and licked her vagina. B. Doe realized this was "definitely not a test." The incident lasted about 20 minutes. A couple of days later, B. Doe went to Picazo, "really confused," and said, "You ate me out." He said, "Yeah,

5

I can't believe I ate you out." After this, Picazo would say, "You are for sure a lesbian. Your sister is bisexual, and [M. Doe] is straight."

At that time, B. Doe was a junior in high school. She had gone from getting "straight A's" to getting "straight F's" and had been assigned a personal counselor when teachers noticed she had suddenly become depressed. When B. Doe told her girlfriend about the incidents with Picazo, the girlfriend got angry and told B. Doe she was stupid, Picazo just wanted to watch her masturbate. This made B. Doe depressed, as did the fact that she felt "so disgusting at myself." She told her counselor she did not want to be alive, the counselor called 911, and she was taken to the hospital. She told the doctor about Picazo molesting her when she was a little girl and also told her mother; this was the first time she had told anyone about it. Margarita testified that when she got to the hospital and asked what happened, B. Doe said, "It's my uncle. . . . He's a dirty man," and told Margarita that Picazo had been molesting her.

### Police Investigation

On March 1, 2013, Daly City Police Detective Ron Harrison received a referral from Child Protective Services relating B. Doe's disclosure that she had been molested by Picazo when she was five or six years old and then recently, as a teenager, forced to masturbate in front of him. Detective Harrison interviewed B. Doe on March 8, 2013, at the Keller Center, a forensic interview center at the San Mateo Hospital. B. Doe testified that she had been in the hospital for about two weeks and by the time she met with the detective she was feeling "a little more confident."

On March 13, 2013, Detective Harrison had B. Doe make a pretext phone call to Picazo. The call was recorded but was not booked into evidence; Detective Harrison did not know why. Harrison listened and took notes, then

6

wrote a report. He testified that the call lasted about 20 minutes. B. Doe told Picazo she had been thinking about what happened when she was a kid and asked him about touching her; he said he did not remember anything like that. She asked, "Why did you eat me out?" Picazo responded, "You know I never did that to you. If you want me to go to jail, that's fine, but I didn't do anything like that." B. Doe also asked, "If you know I like girls, why eat me out?" Picazo said he did not know and "now he knows." B. Doe told him she was going to talk to her therapist and Picazo said "he did not eat her out as a sexual thing. He did it—he ate her out to help her understand if she liked men or women and that he would do that for any member of his family and if he had to go to jail for that, that would be fine." Picazo said he felt bad about what happened, was sad she was hurting from it and was concerned about her.

B. Doe testified that the pretext call was very short—one or two minutes. When she asked Picazo if he remembered the things he did to her when she was little, he first denied it, then told her that if she spoke up, his family would break up and his newborn child would grow up without a father. She did not recall Picazo saying he did not "eat [her] out as a sexual thing" and would do this for any family member.

B. Doe acknowledged that when she spoke with Detective Harrison in 2013, she told him it was "hard to recall the exact picture" of the molestation when she was little because she had "blocked it" for a long time. She testified that it was hard to recall the exact picture in 2013 because she was taking medications for posttraumatic stress disorder and depression when she was released from the hospital, and the freshest thing on her mind was the recent pornography incident. At trial, she testified, "now I'm sober-minded. I can think very clearly. Now when I look back, it's like I remember."

After the pretext call, Harrison and another detective went to Picazo's house, where Picazo's son told them Picazo had just left. Harrison left his card and asked the son to have Picazo call but never heard from Picazo. The next morning, the detectives went to Picazo's workplace, but he had not shown up for work. Picazo's son in San Diego called Harrison, saying the family was concerned because Picazo had disappeared after a "disturbing phone call" the day before, then found he had withdrawn $5,000 from his joint checking account and taken his passport.

A.R. testified that she was at home when Picazo received a phone call on March 13, 2013. She heard Picazo say " 'Hi, [nickname]' " and " 'but you know that's not true. You know that hasn't happened.' " A.R. suspected Picazo was speaking with B. Doe because B. Doe was the only one he called by this nickname and was "the most troublesome niece that I had." Picazo appeared concerned and nervous. A.R. initially testified that the call lasted 35 or 45 minutes, then acknowledged she left for work before the call ended. When she got home, Picazo was not there and her sons said he had received a call telling him to go to Mexico because his mother was ill. A.R. checked the bank account and saw that Picazo had withdrawn $5,000. She did not recall whether she looked to see if Picazo had taken his passport or told Harrison Picazo had taken it; Harrison testified that A.R. told him the passport was missing and she believed Picazo took it when he fled. Picazo did not take any other possessions when he left.

### Molestation of A. Doe

A. Doe was 21 years old at the time of trial. She testified that she had a memory of lying in bed next to Picazo in the first house in San Francisco when she was three or four years old; Picazo grabbed her hand, put it on his penis, and told her not to tell her aunt because she would get mad. A similar

8

thing occurred when A. Doe was about 10 years old:  During a drive to Mexico, Picazo had his son drive and Picazo sat in the back seat next to A. Doe, grabbed her hand and put it on his penis over his clothes.

A. Doe testified that she began living with A.R. and Picazo when she was about 10 years old and B. Doe moved there later.  Picazo would take A. Doe, B. Doe, M. Doe, and Alexander out to eat or to the mall and would buy them clothes or "materialistic stuff."  Picazo would make comments that made A. Doe uncomfortable:  He would tell her she had "really nice boobs" and once at the grocery store when she was about 11, he told her she was "turning him on."

Once, when A. Doe was almost 12, she and Picazo were alone in the house and Picazo kissed her on the lips and tried to kiss her "with tongue." She wiped the saliva off her face and he said, " 'The more you wipe it, the more I'm going to do it.' "  A. Doe slept on the pullout couch in the living room and sometimes would wake up in the middle of the night to find Picazo watching her sleep.  She started to sleep in her cousin Alexander's room, thinking this might stop Picazo from coming in, but it did not:  Picazo would come into the room in the middle of the night and caress A. Doe's legs. A. Doe remembered this happening a couple of times when she was 12 years old; once, she tried to kick him and he held her legs down by the ankles. When she asked why he was doing this, Picazo told her she had been having a nightmare.  Once, Picazo continued to rub her legs up from her ankles, under her basketball shorts, and touched her "butt" and back.

During the summer of 2011, when she was 12 years old, Picazo told her that he knew about a test to help her figure out whether she liked boys or girls, and that her sister had done a similar test.  A. Doe thought it was a "dumb idea" and ignored it, but Picazo kept bringing it up and after about the

9

third time, she agreed. Picazo said M. Doe could be there if A. Doe wanted her to be, which she did. Picazo had A. Doe lie on the bed in his room, M. Doe sat on a chair next to the computer desk, and Picazo was standing. Picazo told A. Doe to cover her eyes; he said he and M. Doe would touch different parts of A. Doe's body and she needed to figure out which was "the most uncomfortable or the one that I don't like." Picazo explained that he would say, "this is me," and she should tell him when to stop, then he would say "this is M. Doe" and she should do the same thing. Picazo started touching the bottom of her leg and by the time he got to her knee, A. Doe said "stop." The same thing happened with M. Doe. Picazo lifted her shirt and touched her stomach and A. Doe said "stop"; he said, "this is M. Doe" and A. Doe again felt a hand on her stomach and said "stop." M. Doe then left because her mother called her. Picazo lifted A. Doe's shirt and she started crying and said "stop." Picazo did not stop touching her; he told her to "just let it happen, that 'it's good that you cry. You need to let it out.' " He told her to take her pants off and she did, then she started crying even more, he told her " 'It's good to let it out' " and she said to stop. Picazo continued touching her stomach and placed his hand on her vagina, over her underwear. She said she did not want to do this anymore and Picazo got up.[5]

On another occasion, Picazo put pornography on his computer and had A. Doe choose what to watch because he wanted to know what kind of pornography she liked. He told her to take her pants and underwear off,

---

[5] The defense recalled A. Doe and elicited her testimony that when M. Doe's mother called her, she left A. Doe alone with Picazo. A. Doe acknowledged that she had told Detective Harrison she "went with M. Doe." She clarified that she did not mean she left the room with M. Doe; she meant she knew M. Doe was downstairs and, when A. Doe left, she went down to be with M. Doe.

10

grabbed a vibrator from the drawer and touched her clitoris with it, saying this would help her know if she liked boys or girls. He told her that her vagina "looked nicer than [M.] Doe's and [B. Doe's]." A. Doe said she wanted to stop, got dressed, and left the room.

A. Doe testified that she never talked about what happened with B. Doe or M. Doe and never told her mother; she thought they would not believe her because Picazo was married to Margarita's sister. She later said she discussed it with M. Doe in 2013. A. Doe acknowledged that in 2013, she did not tell Detective Harrison about the incidents that happened when she was younger than 12 or about the vibrator incident. The first time she disclosed the touching when she was three years old, the car trip to Mexico, the kissing incident, and the vibrator was when she met with the district attorney, Detective McQuade, the day trial began. She testified that in 2013, she knew Picazo had left the country and "this wasn't going anywhere"; she didn't see the point of Detective Harrison "prying in my personal stuff" and, as a 14 year old, it was hard to talk about a vibrator being used on her. When she met with the prosecutor, she shared things she had not previously told Harrison because the trial was coming up, she "actually started to believe that he can get what he deserves," and she felt more comfortable sharing things with a female.

### K.P. and A.P.

K.P. dated one of Picazo's sons when she was 16 or 17 years old. When the relationship ended, they remained friends and their families remained close. Picazo offered K.P. a job at a produce store, where he was the manager. She testified that she thought she was 17 when she began working there, then later said she was 18. One day after work, Picazo took K.P. to a hotel near work. She asked Picazo to leave the door to the hotel room open

11

because "it seemed strange to me why we were there." Picazo asked her to lie down on the bed and she felt uncomfortable, then after he lay down she "didn't see anything wrong," and they chatted. Picazo said he did not "have intimacy" with his wife and asked if she had sex with his son. K.P. testified that Picazo never did anything to her that she did not like and denied that he slapped her on the buttocks. When shown a transcript of her interview with Detective Harrison, in which she said Picazo "slapped my butt," K.P. said she did not recall saying this. The transcript of her interview reflected that she told Detective Harrison that Picazo asked her if she had ever "gone out with a woman," how many boyfriends she had had, what she liked about a man, and what she would do with a boyfriend " 'intimacy-wise' "; K.P. testified that she did not recall, but acknowledged she "probably" told the detective these things. K.P. acknowledged having told the detective that Picazo "had done a lot for [her] family" and helped her parents financially, although she stated at trial, "[h]e simply gave us a job."

A.P., K.P.'s younger sister, met Picazo when she was around 15 or 16 and visited her sister at the produce store. She trusted Picazo and "saw him as [her] father." Picazo would take her shopping with M. Doe, including at Victoria's Secret, and buy them clothes and underwear. He would take her to eat at fancy restaurants, sometimes just her and sometimes with K.P., one of Picazo's sons, and Alexander, and M. Doe.

Picazo made her feel uncomfortable at times, when he would tell her about "sexual stuff" with past girlfriends. Once, while driving in his car, Picazo told A.P. how he took off his former girlfriend's clothes and "how he would make her feel hot," and touched A.P.'s left thigh. Once Picazo tried to kiss A.P. on the mouth. When she was 16, he took her and M. Doe to a sex toy shop, at her request; he spent $500 on sex toys for her and M. Doe did not

12

get anything. Picazo later asked A.P. if she used the toys. When she was 17, he slapped her buttocks when they were "playing around." He showed A.P. a picture of his wife in lingerie, which made A.P. uncomfortable. A.P. once saw Picazo give M. Doe a quick kiss on the lips as they were coming out of a store.

Picazo told A.P. he studied psychology, asked if she liked girls, said there was a psychology test to show her if she was "capable," and told her, "you're going to take the test." He teased her about having "granny panties" and asked her if she liked girls.

### Computer Files

When Detective Harrison interviewed A.R. on March 15, 2013, she gave him permission to take the computer Picazo used. The computer, located in Picazo's bedroom, was the only one in the home and, according to A.R., was used by everyone in the house. The prosecution's expert in computer forensic examination found five viewable files containing child pornography, four of which showed prepubescent females engaged in sexual activity. The parties stipulated that the five files were "legally child pornography."

### Picazo's Statement to the Police

Picazo was extradited to San Diego, and Detective McQuade interrogated him at the San Diego County jail on February 28, 2019. The interview was recorded and played for the jury at trial. McQuade testified that Picazo's demeanor was calm at the beginning of the interview, but as he was asked more pointed questions, especially about the test, he began perspiring, became very restless and fidgety, and stopped making eye contact.

Picazo denied knowing anything about the molestation B. Doe and A. Doe reported. He said B. Doe was confused about her sexuality and one day when she was upset, crying and drunk, he told her to "watch everything"

13

on the computer.  When he found her watching pornography, he told her he was not "asking you to look for porno to know if you like boys or like girls" but just wanted her to see "what do you like on boys."  He told her to write what she liked on boys and on girls.  Picazo said he did not study psychology and denied telling B. Doe he knew of a test that could help her find out whether she was straight or gay, having her lie on the bed and taking off her pants and underwear, or giving her a vibrator.  He denied taking B. Doe to a sex toy store but said that A.P. asked him to get her a sex toy and he took her, A. Doe, and Alexander to the store and bought a sex toy for A.P. and one for his wife.  When told that B. Doe said he touched her vagina and put his mouth on it, Picazo denied ever touching her.  Picazo said he always told the children that if someone touched them, they should tell their mother, the doctor, or a teacher.  He thought B. Doe might be saying these things about him because she wanted attention from her mother.

Picazo denied ever touching A. Doe, denied telling A. Doe about a test to help her figure out whether she liked girls or boys, and denied the incident she described with him and M. Doe touching her.  Asked why A. Doe might be saying these things, Picazo said, "[u]nless their mom told 'em to say it, I don't know," and said, "that's why I left San Francisco.  Their—their family means—is they were all in rescanning me in—in something."  When told that M. Doe and Vanessa also said he had done things to B. Doe and A. Doe and talked about the test, Picazo repeated that he never touched them and said the "test" did not involve touching, it was just a computer test:  "They were just gonna look at the computer and see—and then she was gonna write why she likes it."  At this point in the interview, McQuade commented that Picazo looked "completely stressed out right now," sweating, shaking, and unable to make eye contact.

14

Picazo remembered the phone call from B. Doe but said he was already driving to Mexico when she called. The call was quick, "maybe a minute." Confronted with the fact that the call lasted some 20 minutes and its contents, Picazo said he did not know "eating out" meant oral copulation; he thought it meant "talking bad about somebody." He denied saying he would do it for any family member if he had to and he denied saying " 'I didn't eat you for a sexual thing.' " When the detective said he knew from Alexander that Picazo did not leave for Mexico until after the call, Picazo said he now remembered that he decided to go after the call. He said he knew something was wrong with the call and the police were investigating, he figured they would not find anything and would know he did not do anything but was afraid to go to jail in the meantime and be sexually abused there.

After the detective told Picazo that DNA from B. Doe's vagina matched Picazo's DNA on the computer (a ruse, as no DNA was actually collected), Picazo insisted he did not touch her, then said he might have kissed her "butt cheek" but insisted it was not a "sexual thing." He said he opened the door and saw B. Doe on the bed, naked, touching herself; he told her if she wanted to do this she should go to the bathroom where no one could see her, and maybe he gave her a kiss so she would not feel bad. Picazo drew a picture of B. Doe's body to show how kissing her butt might have left saliva that ran to her anus and vagina and, on a picture the detective drew, Picazo pointed out the area where he kissed her. Picazo told the detective he was sure he did not kiss B. Doe's vagina because there was hair between her vagina and anus: "I remember that she shave herself and . . . there was, like, some part of it she—she couldn't reach it. . . . So that was like—I knew after that was the vagina and I never went under to the vagina." McQuade testified that

15

when he was drawing his picture, Picazo was watching and McQuade could hear Picazo "audibly breathing heavier and heavier."

Picazo was surprised when told B. Doe was sad "about all this" and had been going to therapy, saying "I thought at that age it was okay." He denied touching B. Doe's vagina or making her touch his penis when she was five years old. Detective McQuade suggested Picazo write an apology to B. Doe and Picazo began several letters in Spanish but did not finish them. He said he wanted to say he was sorry and did not know she was suffering so much, and wished he could do something. At McQuade's suggestion, Picazo recorded a message to B. Doe saying he was suffering but now realized she was suffering also; they were both suffering from "a two-second error"; he hoped that one day she would forgive him, that she knew he always loved her and it was not her fault; and that he was "paying right now" because he was "the one who made the mistake, not you."

### Child Sexual Abuse Accommodation Syndrome

Mariam Wolf, a licensed clinical social worker testified as an expert in the area of child sexual abuse accommodation syndrome (CSAAS). She was not familiar with the facts of this case; her testimony was meant to provide context for behaviors commonly seen in child sexual assault cases, not to determine whether it happened here. She testified CSAAS is not a recognized diagnosis and should not be used to determine whether a person has experienced sexual abuse or to assess a witness's credibility, but rather as a framework for "having a conversation about patterns of behavior."

CSAAS has five components: secrecy; helplessness; entrapment and accommodation; delayed, conflicted and unconvincing disclosure; and retraction. First, child sexual abuse generally occurs in secret, without other witnesses, and in the vast majority of cases, the perpetrator is someone

16

known and trusted or important to the child.  The perpetrator controls the messaging about secrecy, sometimes by directly telling the child not to tell anyone and sometimes more subtly, as by suggesting potential consequences like "we won't be able to see each other anymore."

Helplessness relates to the developmental gap between the child and the adult (or older person):  The child and the adult do not understand the sexual encounter in the same way and the adult ascribes the meaning to it. This component also includes emotional helplessness:  Because of the messaging about secrecy, the child cannot go to the people (parent, friend, teacher) they would normally go to for help with a problem.

Entrapment and accommodation refer to the child being stuck in the situation as a result of the secrecy and helplessness, and therefore having to figure out how to cope with it.  The literature identifies myriad ways of reacting and no way to predict who will fall in what category.  One coping strategy is to block out the abuse.  Some compartmentalize the abuse and appear fine to the outside world; others develop psychosocial symptoms like depression, anxiety, or hurting themselves, withdraw, or get into trouble.[6] Some disassociate, working hard to not think about the abuse and have their minds go elsewhere.  Some try to avoid the abuser, such as a child being molested by the piano teacher quitting piano lessons, but many do not do this.

Following from secrecy, helplessness, entrapment, and accommodation, if a child does disclose abuse, the report is often delayed by weeks, months, or years.  Disclosure is often conflicted, meaning the child does not relate all the details at once but rather reports incrementally and not necessarily in a

---

[6] Symptoms such as depression, anxiety, and suicidal ideation may also occur in children and adolescents who have not suffered child sexual abuse.

logical sequence, " 'testing the waters' " to see how the information will be received.  Delayed and incremental disclosure may be unconvincing to the adult listener because it may not conform to adult expectations for what child sexual abuse disclosure should look like.

With respect to delayed disclosure and abused children not avoiding the situation where abuse occurs, Wolf explained that from the child's perspective, it may be worth putting up with ongoing sexual abuse in order to continue having everything else that "goes along with that relationship or circumstance."  For example, a child being abused by a football coach may be able to stop the abuse by disclosing it or avoiding football practice, but this would mean no longer playing football and hanging out with friends on the team.

The final component of CSAAS, retraction, refers to the fact that many children who disclose sexual abuse at some point take back the disclosures in whole or in part.  When the consequences they worried about, or the perpetrator warned about, come to pass—no football, no family Thanksgiving—the child may find it easier to say "I made it up" and be able to avoid those consequences.

Wolf testified that many of the dynamics of CSAAS persist into adulthood, and retrospective studies show that most people delay reporting even into adulthood.  The absence of one of the components of CSAAS does not mean sexual abuse did not occur:  "This is not a checklist where we look to see how many of these we can tick off to then determine whether a child was sexually abused or not.  These are common patterns of behavior, but they can't be used to determine whether a child was, in fact, sexually abused or not.  The purpose of them is to describe factually . . . why some of these

18

things do happen in true cases of child sexual abuse, even though they seem counterintuitive to what we as adults might expect."

Wolf testified that "grooming" is the process by which an adult "readies the child and their environment for child sexual abuse." This might initially appear to be simply taking an interest in the child in a normative fashion, and it may only be in retrospect that grooming can be distinguished from a healthy relationship. Grooming refers to the perpetrator setting up the relationship with the intent to at some point engage in sexual behavior with the child. It starts to look different from a healthy relationship when it begins to include "desensitization to touch and sexual behaviors or sexual topics or engagement around sexual behaviors and topics." This might include showing the child sex toys and regularly discussing sexual topics.

## DISCUSSION

### I.

### *The Trial Court Did Not Abuse its Discretion in Allowing a Support Dog to Accompany B. Doe and A. Doe When They Testified*

Section 868.4, which took effect on January 1, 2018, authorizes a trial court to permit a "therapy or facility dog" (support dog) to accompany certain witnesses during their testimony. Over Picazo's opposition, the trial court granted the prosecution's motion to allow B. Doe and A. Doe to have a support dog, Clover, with them when they testified. B. Doe was accompanied by a victim advocate on the first day of her testimony and by the support dog for the continuation of her testimony the following day; A. Doe used the support dog for all of her testimony. Picazo contends the trial court erred in allowing the support dog to accompany these witnesses and in failing to take proper precautions or adequately instruct the jury.

Section 868.4 provides, in pertinent part as follows:

19

"(a) If requested by either party in a criminal or juvenile hearing . . . the following individuals shall be afforded the opportunity to have a therapy or facility dog accompany him or her while testifying in court, subject to the approval of the court:

"(1) A child witness in a court proceeding involving any serious felony, as defined in subdivision (c) of Section 1192.7, or any violent felony, as defined in subdivision (c) of Section 667.5.

"(2) A victim who is entitled to support persons pursuant to Section 868.5,[7] in addition to any support persons selected pursuant to that section.

"(b) Before a therapy or facility dog may be used pursuant to subdivision (a), the party seeking to utilize the therapy or facility dog shall file a motion with the court, which shall include the following:

"(1) The training or credentials of the therapy or facility dog.

"(2) The training of the therapy or facility dog handler.

"(3) Facts justifying that the presence of the therapy or facility dog may reduce anxiety or otherwise be helpful to the witness while testifying.

"(c) If a party, pursuant to subdivision (b), makes a showing that the therapy or facility dog and handler are suitably qualified and will reasonably assist the testifying witness, the court may grant the motion, unless the court finds the use of a therapy or facility dog would cause undue prejudice to the defendant or would be unduly disruptive to the court proceeding.

---

[7] Section 868.5, subdivision (a), provides that a prosecuting witness in a case involving a violation or attempted violation of specified Penal Code sections, including those with which Picazo was charged, "shall be entitled, for support, to the attendance of up to two persons of the prosecuting witness' own choosing, one of whom may be a witness, at the preliminary hearing and at the trial, or at a juvenile court proceeding, during the testimony of the prosecuting witness."

"(d) The court shall take appropriate measures to make the presence of the therapy or facility dog as unobtrusive and nondisruptive as possible, including requiring the dog to be accompanied by a handler in the courtroom at all times.

"(e) If a therapy or facility dog is used during a criminal jury trial, the court shall, upon request, issue an appropriate jury instruction designed to prevent prejudice for or against any party."

Picazo does not dispute that B. Doe and A. Doe were victims of a crime enumerated in section 868.4, subdivision (a)(2). He contends, however, that the prosecution failed to present the justification required by the statute in that the motion contained only generalities rather than facts specific to B. Doe and A. Doe; that the record does not indicate the court took any precautions to make the presence of the support dog unobtrusive and nondisruptive; and that the trial court's instruction to the jury was insufficient.

### *The Factual Justification Was Sufficient*

The prosecution's motion argued that the witnesses had a right to the presence of a support dog under the statute and caselaw; set forth the training and credentials of Clover and her handler, including that Clover had accompanied victims and witnesses in hearings at the San Mateo County Superior Court 14 times; and described research showing the "physical and mental health benefits that a pet can bring to the owner" and effect of petting an animal in "significantly reduc[ing] stress levels" and "decreasing anxiety, reducing blood pressure, lowering heart rate, decreasing depression, and even improving mental clarity." As to B. Doe and A. Doe, the motion argued, "All three victims were minors when they were molested by the [Picazo]. Each victim has requested that Clover be present in the courtroom during their

21

testimony for emotional support.  Clover will be able to provide [B.] Doe, [A.] Doe, and [M.] Doe with emotional support during their testimony."

Picazo argues that section 868.4 requires an "evidence-based witness-specific" justification that was not satisfied by the prosecution's discussion of the effects of support animals in general.  We agree that the factual justification must pertain to the testifying witness (as opposed to a class of witnesses in general).  Section 868.4, subdivision (b)(3), requires a showing of "[f]acts justifying that the presence of the therapy or facility dog may reduce anxiety or otherwise be helpful *to the witness while testifying*."  (§ 868.4, subd. (b)(3), italics added.)  This precondition to use of a support dog has no counterpart in section 868.5, which gives specified witnesses the right to be accompanied by a support person during their testimony without any factual justification.  (§ 868.5, subd. (a) ["prosecuting witness . . . shall be entitled, for support, to the attendance of up to two persons of the prosecuting witness' own choosing . . . during the testimony of the prosecuting witness"].)[8]  Like

---

[8] Picazo emphasizes that section 868.5 provides the prosecuting witness is "entitled" to a support person, while section 868.4 provides only an "opportunity" for a witness to be accompanied by a support dog.  (§ 868.4, subd. (a) ["the following individuals shall be afforded the opportunity to have a therapy or facility dog accompany him or her while testifying in court, subject to the approval of the court . . ."].)  In other words, while the trial court has no discretion to deny a support person for a witness specified in section 868.5, the court has discretion whether to allow a support dog for a witness eligible under section 868.4.

But Picazo mischaracterizes the trial court's ruling in arguing that "contrary to the trial court's determination, subdivision (a) affords only 'the opportunity' to have a support dog accompany certain witness[es], not an absolute right to have a support dog."  The court never indicated witnesses have an absolute right to a support dog; it stated that the statutes "specifically allow for it in this case and I don't see that it would be overly prejudicial."  The court acknowledged that "most people, I think, like animals and I get the argument that they may associate seeing the dog with the

22

section 868.5, section 868.4 is by definition limited to specified classes of witnesses the Legislature has deemed particularly vulnerable. The factual justification requirement in section 868.5 would be meaningless if it was not tied to the particular witness seeking to be accompanied by a support dog.

The real question Picazo raises is what must be shown to establish that the support dog "may reduce anxiety or otherwise be helpful to the witness while testifying." (§ 868.4, subd. (b)(3).) Picazo argues that "[i]f the Legislature did not intend for the factual justification to be an evidence-based witness-specific showing, it would not have used the language '*to the witness while testifying.*'" (Italics added.) This language, as we have said, supports Picazo's argument that the factual justification must be witness specific, but it does nothing to illuminate the substance of the factual justification requirement. Picazo does not explain what "evidence based" showing he believes is required, or why research showing the emotional benefits of a support animal, combined with a witness's request for a support dog, is insufficient to show that the support dog "may reduce anxiety or otherwise be helpful to the witness while testifying." (*Ibid.*)

The crux of Picazo's argument is that the prosecution failed to demonstrate why a support dog was justified because B. Doe and A. Doe were adults at the time of their testimony. As he points out, the two cases the prosecution relied on in requesting the support dog, *People v. Spence* (2012) 212 Cal.App.4th 478 and *People v. Chenault* (2014) 227 Cal.App.4th 1503 (*Chenault*), involved child sexual abuse victims who were minors at the time they testified. Picazo asserts, and our research confirms, that there are no

---

victim as taking some sympathy on her, but there will be a specific instruction about that."

published California cases addressing use of a support dog by an adult witness.

Picazo also asserts, however, that *Chenault* distinguished between child and adult witnesses and "did not permit the use of a support dog for adult witnesses." *Chenault* is of particular significance because the Legislature expressly stated in section 868.4 that the statute was intended "to codify the holding in [*Chenault, supra,*] 227 Cal.App.4th 1503 with respect to allowing an individual witness to have a support dog accompany him or her when testifying in proceedings as provided in subdivision (a)." (§ 868.4, subd. (g)(1).) Picazo views *Chenault* as demonstrating that "adults are not treated the same as minors and the very authority on which the People relied [in its motion below] drew this critical distinction and did not permit the use of a support dog for adult witnesses."

The trial court in *Chenault*, in explaining its decision to allow use of the support animal, expressly noted that the motion involved only the testimony of the two victims "who are still minors" and not the "now adult victims." (*Chenault, supra*, 227 Cal.App.4th at p. 1512.) But the prosecution in that case did not request a support dog for the victims who had become adults by the time of trial, only for the two victims who were still minors. Notably, the authority the prosecutor relied on in *Chenault* was Evidence Code section 765, subdivision (b), which offers special protection to witnesses who are young or cognitively impaired: "With a witness under the age of 14 or a dependent person with a substantial cognitive impairment, the court shall take special care to protect him or her from undue harassment or embarrassment, and to restrict the unnecessary repetition of questions."[9]

---

[9] Evidence Code section 765, subdivision (b), continues, "The court shall also take special care to ensure that questions are stated in a form which is

24

Picazo's characterization of *Chenault* as not permitting adult witnesses to testify with a support dog is thus misleading: The trial court simply observed that it was not considering the question of a support dog for now-adult victims of childhood abuse, and the *Chenault* opinion did not address the issue except to note the trial court's observation. " '[A]n opinion is not authority for a proposition not therein considered.' " (*People v. Williams* (2005) 35 Cal.4th 817, 827.)

Moreover, while section 868.4 was expressly intended to codify *Chenault*, we interpret the statute itself. Section 868.4 authorizes use of a support dog, under the specified circumstances, for two categories of witnesses: "[a] child witness" in a court proceeding involving any serious or violent felony (§ 868.4, subd. (a)(1)), and "[a] victim" who is entitled to support persons pursuant to section 868.5 (§ 868.4, subd. (a)(2)). Section 868.5 is *not* limited to child witnesses. The conclusion that section 868.4 is not limited to witnesses who are minors at the time of their testimony is inescapable.

Nor does the statute impose any different requirements for consideration of a request to use a support animal depending on whether the testifying witness is an adult or a minor. In either case, the required showing is that "the presence of the therapy or facility dog may reduce anxiety or otherwise be helpful to the witness while testifying." (§ 868.4, subd. (b)(3).)

appropriate to the age or cognitive level of the witness. The court may, in the interests of justice, on objection by a party, forbid the asking of a question which is in a form that is not reasonably likely to be understood by a person of the age or cognitive level of the witness." Subdivision (a) of Evidence Code section 765 provides, "The court shall exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and to protect the witness from undue harassment or embarrassment."

Picazo points to a few cases from other jurisdictions, one of which upheld use of a support dog for a developmentally disabled adult (*State v. Dye* (Wash. 2013) 309 P.3d 1192),[10] one which reversed the trial court's decision to allow a "fully abled adult witness" to be accompanied by a support dog (*People v. Shorter* (Mich. App. 2018) 922 N.W.2d 628 (*Shorter*)),[11] and one in which an adult witness had a support dog with her in gallery, but not during her testimony (*State v. Millis* (Ariz. App. 2017) 391 P.3d 1225 (*Millis*)).[12]

---

[10] The trial court in *State v. Dye, supra,* 309 P.3d at pages 1194–1195, allowed a burglary victim who was an adult with significant developmental disabilities and functioned at a mental age of 6 to 12 years to be accompanied by a support dog during his testimony. The appellate court upheld this exercise of the court's "broad discretion to make a variety of trial management decisions," noting the trial court's " 'implicit' finding of necessity" due to the witness's anxiety about testifying and fear of the defendant, and its express reliance on the witness's " 'significant emotional trauma' and 'developmental disability.' " (*Id.* at p. 1199.)

[11] In *Shorter, supra,* 922 N.W.2d at pages 630–631, the adult victim claimed she awoke to find the defendant, a friend who had spent the night, sexually assaulting her; the defendant disclaimed any sexual conduct. The trial court permitted the victim to testify with a support dog in an effort to reduce her emotional outbursts, based on the prosecution's representation that the victim had been very emotional in meetings but was less so with the dog in the room, and that the victim said she felt more comfortable with the dog and wanted him to accompany her. (*Id.* at p. 633.) *Shorter* stated that "allowing support animals for fully abled adults would be unprecedented, not only in Michigan, but apparently nationwide," and that even if the trial court had inherent authority to allow it, doing so simply because the witness would be " 'more comfortable' " or wanted it would not be sufficient justification. (*Id.* at pp. 634–635.)

[12] The defendant in *Millis, supra,* 391 P.3d at page 1228, was convicted of murdering the eight-month-old son of his former girlfriend. After the mother testified at pretrial hearings accompanied by a support dog, the defense sought to preclude the dog's presence at trial. (*Id.* at pp. 1233–1234.) The trial court denied the motion and the dog accompanied the mother in the gallery, but not during her testimony. (*Id.* at p. 1233.) *Millis* found no abuse of the trial court's " 'broad discretion' in managing trial conduct," rejecting

26

Picazo emphasizes the *Shorter* court's statement that "there is a fundamental difference between allowing a support animal to accompany a child witness, as in [*People v.*] *Johnson* (Mich. App. 2016) 889 N.W.2d 513, and allowing the animal to accompany a fully abled adult witness, as in the instant case." (*Shorter*, at p. 633.) He attempts to distinguish *Millis* factually, and also argues its reasoning was unsound in that all the cases it relied upon involved witnesses who were minors or developmentally disabled.

These cases are not particularly helpful in interpreting section 868.4, as none involved a statute expressly authorizing witnesses' use of support animals. Moreover, *Shorter*'s refusal to extend to a nondisabled adult the *Johnson* holding that a child witness could be accompanied by a support dog, was consistent with a distinction drawn in Michigan's legislative policy that does not appear in California's. The Michigan statute providing for witnesses to be accompanied by a support person while testifying—which, after *Shorter* was decided, was amended to also provide for use of a support dog during testimony—restricts the eligible witnesses to minors under age 16 and limited categories of older witnesses who are unable to protect themselves

---

the defendant's claims that the dog's presence was " 'presumptively prejudicial' " and the trial court failed to consider appropriate factors. (*Id.* at pp. 1234–1235.) Although the defendant argued that the prosecution failed to make a particularized showing why an adult with no apparent disability needed the support dog, *Millis* noted that the court found the dog would not unfairly prejudice the defendant and "implicitly found that [the dog] would help prevent undue stress for [the witness] during a difficult trial about the death of her infant son." (*Id.* at pp. 1234–1235.) The *Millis* court also observed that after the trial in that case, the state legislature enacted a statute giving courts "discretion to allow an adult victim to be accompanied by a dog." (*Id.* at p. 1234 & fn. 11.) The Arizona statute requires allowing a support dog for a victim who is under 18 years of age, if available. (A.R.S. § 13-442(B).)

due to mental or physical impairment.[13]  As we have said, section 868.4 authorizes use of a support dog for both child witnesses in proceedings involving serious or violent felonies and *any* victim who is a "prosecuting witness" entitled to support persons under section 868.5.

Picazo complains that the prosecution's motion fell "far short of satisfying [section] 868.4[, subdivision] (b)(3) because it provided no written factual justification showing that a support dog was necessary for two able-bodied adults to testify about things that allegedly happened nine years earlier."  First, the statute does not require a demonstration of necessity; it requires only a showing that the dog "may reduce anxiety or otherwise be helpful to the witness while testifying."  (§ 868.4, subd. (b)(3).)  Second, Picazo's argument grossly minimizes the impact of childhood sexual abuse.  According to the expert testimony at trial, the "psychosocial dynamics" that characterize CSAAS "can persist from childhood into adolescence into adulthood."  B. Doe and A. Doe had been subjected to significant trauma by a close family member with whom they lived for much of their lives and who was the primary adult they spent time with as children; for B. Doe, the depth

---

[13] For purposes of the Michigan statute, "witness" is defined as "either 'a person under 16 years of age,' 'a person 16 years of age or older with a developmental disability,' or a 'vulnerable adult.' "  (*Shorter, supra,* 922 N.W.2d at p. 633; MCL 600.2163a(1)(f), (g).)  " 'Vulnerable adult' " is defined as " 'an individual age 18 or over who, because of age, developmental disability, mental illness, or physical disability requires supervision or personal care or lacks the personal and social skills required to live independently' or a person who is 'unable to protect himself or herself from abuse, neglect, or exploitation because of a mental or physical impairment or because of advanced age.' "  (*Shorter,* at pp. 633–634, fns. omitted; MCL 600.2163a(1)(f), MCL 750.145m(u)(i).)

The statute was amended to add provision for use of a support dog in June 2018, shortly after the *Shorter* opinion was filed, and became effective in September 2018.  (Mich. Pub. Acts 2018, No. 282, eff. Sept. 27, 2018.)

of the trauma is demonstrated by the fact that the abuse only came to light after she was hospitalized for two weeks due to suicidal ideation. Testifying at trial required B. Doe and A. Doe to relive the details of their experiences. Given Picazo's flight when the abuse came to light in 2013, the trial was the first time B. Doe and A. Doe were seeing Picazo in seven years, which in itself had obvious potential for emotional upset. In these circumstances, the fact that B. Doe and A. Doe requested the support dog's presence for emotional support, as stated in the prosecutor's motion, indicated the dog "may reduce anxiety or otherwise be helpful to the witness while testifying." (§ 868.4, subd. (b)(3).)

Picazo's assertion that the factual justification requirement demonstrates the Legislature's view that "the general benefits of having a support dog are not enough to justify having a support dog present while testifying unless the moving party demonstrates that a dog *would* reduce anxiety or be helpful to the particular testifying witness," overstates the statutory requirement (that the dog "may" have this effect). In response to the Attorney General's argument that the statute does not require a victim to present evidence of specific anxieties and stresses (personalized declaration, testimony about specific anxieties and stresses, waiver of patient-therapist privilege), Picazo asserts that revealing confidential information would not necessarily be required or could be examined in camera. Where the potential trauma of testifying is as self-evident as it is in this case, however, we are hard-pressed to see what meaningful additional justification could be provided without requiring the witnesses to reveal personal and/or confidential information. Given the obvious purpose of section 868.4 to support vulnerable victims by mitigating the unpleasant and potentially

29

traumatic nature of a trial,[14] we will not assume the Legislature intended to subject such victims to an evidentiary ordeal before allowing them the support intended to relieve their anxiety and stress.[15]

### *Picazo Has Not Shown the Court Failed to Take Adequate Precautions*

As indicated above, section 868.4, subdivision (d), requires the trial court to "take appropriate measures to make the presence of the therapy or facility dog as unobtrusive and nondisruptive as possible, including requiring the dog to be accompanied by a handler in the courtroom at all times." Picazo argues the trial court failed to comply with this requirement in that the court

---

[14] The author of the bill that led to enactment of section 848.4 noted, among other things, the Legislature's declaration of "intent to ensure that all victims and witnesses of crime be treated with dignity, respect, courtesy and sensitivity" (§ 679) and commented that "[h]aving a courthouse dog is another step in the process to assist victims and address the need for more compassion in the legal system." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 411 (2017–2018 Reg. Sess.) June 27, 2017.)

[15] Picazo mischaracterizes the Attorney General as arguing that "there is no requirement in Penal Code section 868.4 that the facts justifying the need for a support dog 'be specific to the victim witness' " and that "providing a specific account of why a therapy dog would be helpful to the witness is not necessary because therapy dogs are commonplace." As to the former, the Attorney General argued, "Despite Picazo's argument that the showing must be specific to the victim witness, there is no requirement that the victim witness present a personalized declaration, testify under cross-examination about the witness's specific anxieties and stresses, or waive patient-therapist privileges to allow their therapists to present evidence of their anxieties and stresses." In other words, the Attorney General challenged what the factual justification must consist of, not the requirement that the justification pertain to the particular witness. As to therapy dogs being "commonplace," the Attorney General's point was not that this makes a witness-specific justification unnecessary but that "there is neither stigma to the beneficiary nor prejudice to the defendant in recognizing that a court hearing may more easily get to the truth if the witness is calmer."

30

made no record as to where the dog was located, whether it was "as unobtrusive and nondisruptive as possible," visible to the jury or distracting; where the dog handler was located; how the dog entered and exited the courtroom; or whether the dog was "paraded in front of the jury." As Picazo observes, *Chenault* noted that the trial court adopted procedures to minimize distraction due to the dog's presence by having the dog and handler situated while the jury was in recess, with the handler sitting near the back door of the courtroom, although the dog was visible to the jury due to space constraints. (*Chenault, supra*, 227 Cal.App.4th at p. 1519.) In *Spence*, the child witness testified with a dog sitting at her feet behind the witness stand; the court commented that this particular dog had been in the courtroom before, was well-behaved, and would be " 'almost unnoticeable once everybody takes their seat on the stand.' " (*People v. Spence, supra*, 212 Cal.App.4th at p. 512.)

Here, the record provides virtually no information about the support dog's presence in the courtroom. In granting the motion, the trial court stated, "I understand that, you know, most people, I think, like animals and I get the argument that they may associate seeing the dog with the victim as taking some sympathy on her, but there will be a specific instruction about that. . . . And again, the law 868.4 and .5 specifically allow for it in this case, and I don't see that it would be overly prejudicial." The court found that the training requirements in section 868.4 had been satisfied and asked a question about the current status of the handlers' certifications, which was subsequently clarified. The court also noted that, according to the motion, the support dog had been used approximately 14 times, and the prosecutor represented that she was not aware of any problems or negative issues with using the dog. The record does not reflect any discussion of or orders

concerning matters such as where Clover would be located and how she would enter the courtroom; the only references to the support dog in the court's minutes are to the prosecution's motion being filed, the court granting that motion and denying Picazo's request for it to be denied; and the certification for the support dog handler being placed on the record.

In Picazo's view, the fact that the record is silent as to whether the trial court took any precautionary measures means we cannot find the court complied with the section 868.4, subdivision (d), and his convictions must be reversed. But " 'a trial court is presumed to have been aware of and followed the applicable law. [Citations.]' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114, quoting *People v. Mosley* (1997) 53 Cal.App.4th 489, 496–497.) " 'Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error." (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549, quoting *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

The record gives no indication that Clover caused any disruption in the proceedings or that any issues were raised as to the dog's location during the witnesses' testimony or the jury's reaction to her.

### *The Jury Instructions Were Adequate*

Section 868.4, subdivision (e), provides: "If a therapy or facility dog is used during a criminal jury trial, the court shall, upon request, issue an appropriate jury instruction designed to prevent prejudice for or against any party." Subdivision (g)(2) of section 868.4 states that "[n]othing in this section abrogates the holding in . . . *Chenault* regarding the need to present appropriate jury instructions."

In its preliminary instructions, the court told the jury, "[s]ome witnesses may have a person and/or dog present during their testimony. Do

32

not consider the presence of such a person or dog and dog handler who is with the witness for any purposes or allow it to distract you." In its instructions after the close of evidence, the court told the jury, "[B.] Doe and [A.] Doe had a person and dog present during their testimony. Do not consider the presence of the person and dog and dog handler who was with them for any purpose." Picazo contends these instructions were inadequate because they did not admonish the jury not to have sympathy for the witness due to the presence of the support dog and/or not to allow the dog to alter its opinion of the witness or the defendant.

Picazo contends that the Legislature's view of an adequate instruction can be discerned from its statement in section 868.4, subdivision (g)(2), that "[n]othing in this section abrogates the holding in . . . *Chenault* regarding the need to present appropriate jury instructions." *Chenault* held that "whenever the support dog's presence becomes known, or is likely to become known, to the jury, it generally will be the preferred practice for the court to give an appropriate admonishment to the jury to avoid, or at least minimize, any potential prejudice to the defendant. For example, the court may admonish the jury that it should disregard the dog's presence and decide the case based solely on the evidence presented, should not consider the witness's testimony to be any more or less credible because of the dog's presence, and should not be biased either for or against the witness, the prosecution, or the defendant based on the dog's presence." (*Chenault, supra*, 227 Cal.App.4th at pp. 1517–1518.) The court offered as "one example of an appropriate instruction," the one given in *People v. Tohom* (N.Y.App. Div. 2013) 969 N.Y.S.2d 123, 128. (*Chenault*, at p. 1518, fn. 9.) That instruction directed the jurors not to speculate as to why the court decided to allow the support dog to accompany the witness and stated, "You must not draw any inference either favorably or

negatively from either side because of the dog's presence. You must not permit sympathy for any party to enter into your considerations as you listen to this testimony, and this is especially so with an outside factor such as a companion dog permitted to be present in the courtroom. Each witness's testimony must be evaluated based upon the instructions I give you during my charge and on nothing more." (*Tohom*, at p. 128.)

Picazo also points to instructions approved by courts in other jurisdictions. *Commonwealth v. Purnell* (Penn. 2021) 259 A.3d 974, 986 noted that among the measures used by the trial court "to mitigate against any potential prejudice the comfort dog could have caused" the defendant, the court "twice instructed the jury not to consider the presence of the dog for any purpose, not to attribute any sympathy to [the witness], and not to judge her credibility any differently." In *State v. Devon D.* (Conn. 2016) 138 A.3d 849, 863, the jury was instructed that "[t]he witness is anxious about testifying in front of a group of people," "[t]he dog is not present due to any concern the witness has with the defendant's presence," and "[t]he . . . dog met the witness [the day before] in preparation for court trial," and admonished "to disregard the presence of the dog, to draw no inference for or against any witness using a dog, that sympathy should play no part in its considerations or ultimate deliberation, and to "[t]hink of the dog like an interpreter, an aid to get the witness' testimony across to you more clearly."

Picazo contends the instructions in the present case were inadequate because they did not include most of the points *Chenault* said should be included: The instructions told the jury not to consider the presence of the dog for any purpose but did not tell the jury not to consider the presence of the dog as reflecting on the witness's credibility or not to be biased for or against the witness, prosecution, or defendant based on the dog's presence.

34

While *Chenault* offered examples of the points an appropriate instruction might include, neither that case nor section 868.4 establish specific elements required for an "appropriate" instruction. The court here used the standard CALCRIM instruction regarding presence of a support person or dog and dog handler: "[Witness's name] (will have/has/had) a (person/dog) present during (his/her) testimony. Do not consider the presence of the (person/dog [and dog handler]) who (is/was) with the witness for any purpose or allow it to distract you." (CALCRIM No. 377.) As far as we are aware, there was no request for a different or expanded instruction.

The instruction given did not specifically direct the jurors not to allow the presence of the support dog to affect their assessment of the witness's credibility, or sympathy for any party, but other instructions told the jurors not to allow "bias, sympathy, or prejudice" to influence their assessment of the evidence, what factors to consider in assessing a witness's credibility, and to "decide what happened based only on the evidence that has been presented to you in this trial" (defined as "the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else [the court] told you to consider as evidence"). We do not " 'judge a single jury instruction in artificial isolation' " but rather " 'consider the jury instructions as a whole to determine whether error has been committed.' " (*People v. Serrano* (2022) 77 Cal.App.5th 902, 909, quoting *People v. Moore* (1996) 44 Cal.App.4th 1323, 1330–1331.) While the specific support dog instruction was not as expansive as the instructions in *Chenault* or the other examples Picazo relies on, in telling the jury not to be distracted by the presence of the support dog and

35

not to consider it for any purpose, the trial court adequately instructed it not to allow the support dog to affect its assessment of the evidence.[16]

Having determined the trial court did not abuse its discretion in permitting B. Doe and A. Doe to testify with a support dog, we need not address Picazo's contention that the presence of the dog was prejudicial, or the standard by which such prejudice should be measured.[17]

## II.

### *The Trial Court Did Not Abuse its Discretion in Admitting Evidence Under Evidence Code Section 1101, Subdivision (b)*

Before trial, the prosecution moved to admit evidence of Picazo's conduct involving K.P. and A.P. pursuant to Evidence Code section 1108, which allows admission of evidence of other sex offenses to prove propensity in a prosecution for commission of sex offenses, and pursuant to Evidence Code section 1101, subdivision (b), to show intent and common plan or

---

[16] In addition to his argument that the trial court failed to give an appropriate instruction as required by section 868.4, subdivision (d), Picazo separately challenges CALCRIM No. 377 as inadequate as a matter of law in light of section 868.4's express codification of *Chenault*. As we have said, *Chenault* offered examples of, not requirements for, appropriate instructions. Our discussion of the court's instruction above necessarily applies to Picazo's direct challenge to CALCRIM No. 377. Further discussion of the latter is unnecessary.

[17] Picazo maintains the effect of allowing adult witnesses to testify with a support dog, without proper precautions or jury instructions, cannot be quantified and therefore constitutes structural error, reversible per se. (E.g., *Vasquez v. Hillery* (1986) 474 U.S. 254, 263–264 [discrimination in grand jury "undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review"].) Alternatively, he argues the violation of his due process rights requires application of the *Chapman* standard of prejudice (*Chapman v. California* (1967) 386 U.S. 18), and that even under *People v. Watson* (1956) 46 Cal.2d 818, 836, reversal would be required because the case against him was not "overwhelming" and credibility of the witnesses was called into question at trial.

scheme. Picazo moved to exclude this evidence on the basis that it did not involve conduct within the scope of Evidence Code section 1108, and stated at the hearing that he also objected to admission under Evidence Code section 1101, subdivision (b).

The trial court denied admission under Evidence Code section 1108, thus precluding the prosecution from using the evidence to argue propensity. The court found the evidence admissible to show intent under Evidence Code section 1101, subdivision (b), concluding intent was at issue because "when [Picazo] does admit any of the physical events, he claims to have had no sexual motive for it; he was just doing it for a, quote, test." The court noted "there is an argument for" admission of the evidence under Evidence Code section 1108 to the extent it could be found to establish a violation of Penal Code section 647.6 (annoying or molesting child under 18) or Penal Code section 243.4, subdivision (e) (sexual battery: touching an intimate part of another person), but found there was "enough ambiguity there," and also saw excluding the evidence under Evidence Code section 1108 as "balanc[ing] the prejudice versus probative under [Evidence Code] section 352" by allowing the evidence to come in only for a limited purpose under Evidence Code section 1101, subdivision (b), and not allowing it to be used to show propensity.

The jury was instructed that the prosecution had evidence, through K.P. and A.P.'s testimony, "of other behavior by defendant that was not charged in this case[,]" and that it could consider this evidence only if the prosecution "proved by a preponderance of the evidence that the defendant in fact committed the uncharged acts." After explaining the preponderance of the evidence standard, the instruction directed, "If you decide the defendant committed the uncharged acts, you may, but are not required to, consider

37

that evidence for the limited purpose of deciding whether the defendant acted with the intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of himself or the alleged victims in this case. In evaluating this evidence, consider the similarity or lack of similarity between the uncharged acts and the charged offenses. [¶] Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. If you conclude that the defendant committed the uncharged acts, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of any particular charge. The People must still prove each charge and allegation beyond a reasonable doubt.

" 'Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, not to prove a person's predisposition to commit such an act, but rather to prove some other material fact, such as that person's intent or identity. (*Id.*, § 1101, subd. (b).) We review the trial court's decision whether to admit evidence, including evidence of the commission of other crimes, for abuse of discretion.' (*People v. Harris* (2013) 57 Cal.4th 804, 841.)" (*People v. Leon* (2015) 61 Cal.4th 569, 597.)

"[T]he uncharged act must be relevant to prove a fact at issue (Evid. Code, § 210), and its admission must not be unduly prejudicial, confusing, or time consuming (Evid. Code, § 352). [¶] The relevance depends, in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent, common design, identity, or other material fact. (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) 'The least degree of similarity

38

(between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' ([*People v.*] *Ewoldt* [(1994)] 7 Cal.4th [380,] 402.)" (*People v. Leon, supra*, 61 Cal.4th at pp. 597–598.)

Picazo first argues the conduct K.P. and A.P. described was not relevant to his intent in the offenses against B. Doe and A. Doe. He maintains that the prosecution argued his conduct with K.P. and A.P. showed that Picazo was grooming them, as he did with B. Doe and A. Doe, and " 'intent to groom' " was not at issue. But the prosecutor was not using this evidence to show "intent to groom." The point of the evidence was that Picazo's grooming of K.P. and A.P., conduct necessarily reflecting sexual intent, tended to show that his conduct with B. Doe and A. Doe was also with sexual intent.

Picazo also argues the conduct with K.P. and A.P. was not sufficiently similar to the charged offenses to be admissible as circumstantial proof of intent. Talking to K.P. and A.P. about sexual things, taking K.P. to a hotel room and having her lie on the bed with him, taking A.P. to a sex shop and buying her sex toys at her request, Picazo maintains, do not reflect the same intent as in the charged offenses because the actions were taken to groom the girls, not to obtain sexual arousal or gratification. Picazo argues other conduct K.P. and A.P. described—slapping their buttocks and trying to kiss A.P. on the mouth—were dissimilar because they took place at the produce store, not in a private bedroom.

As Picazo acknowledges, the least degree of similarity is required when evidence of uncharged acts is used to show intent: The evidence only needs to

39

be "sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 402.) K.P. and A.P. described behavior perfectly fitting the expert testimony on grooming behavior: setting up a relationship with the intent to at some point engage in sexual behavior, including desensitization to touch and sexual behaviors or topics. Picazo frequently talked about sex with K.P. and A.P., as he did with B. Doe and A. Doe; he asked A.P. whether she liked girls and told her about a test he could have her take, as he did with B. Doe and A. Doe, although with A.P. this did not progress beyond talk. The sexual intent reflected in Picazo's behavior with K.P. and A.P. is more attenuated than in his actual molestation of B. Doe and A. Doe, in that the intent to achieve sexual arousal or gratification was less immediate, but it is sufficient to support an inference that Picazo's conduct with B. Doe and A. Doe was in fact committed with sexual intent and not to help them understand their sexuality or some other nonsexual purpose.

Picazo also argues his intent was not at issue because if he committed any of the alleged conduct, his intent was not reasonably in dispute: There was no "middle ground" from which the jury could conclude he committed the charged acts without the requisite criminal intent. (*People v. Balcom* (1994) 7 Cal.4th 414, 422.) In *Balcom*, the victim testified that the defendant put a gun to her head and forced her to engage in sexual intercourse; the defendant conceded he had sexual intercourse with the victim but denied using a gun or otherwise acting against her will. (*Ibid.*) *Balcom* acknowledged that the defendant's not guilty plea put at issue all elements of the offense, including intent, and evidence of uncharged similar offenses would have "some relevance" to his intent in the present offense. (*Ibid.*) "But, because the victim's testimony that defendant placed a gun to her head, if believed,

40

constitute[d] compelling evidence of the defendant's intent, evidence of defendant's uncharged similar offenses would be merely cumulative on this issue" and the "limited probative value of the evidence of uncharged offenses, to prove *intent,* [was] outweighed by the substantial prejudicial effect of such evidence." (*Id.* at p. 423.)

Here, although Picazo's primary defense was that the conduct B. Doe and A. Doe described did not occur, the evidence of his statements in the pretext call and police interview raised the possibility of a "middle ground" in which some of his acts—touching B. Doe's breast, holding a vibrator to her vagina, putting his finger in her anus and licking her vagina, and putting his hand on A. Doe's vagina and touching her clitoris with a vibrator—were committed without sexual intent, as part of a "test" to determine the girls' sexual preferences. Both B. Doe and A. Doe testified that this is what Picazo told them. Detective Harrison's notes from the pretext phone call indicate that Picazo said that "he did not eat [B. Doe] out as a sexual thing. He did it—he ate her out to help her understand if she liked men or women and that he would do that for any member of his family and if he had to go to jail for that, that would be fine." In his interview, Picazo denied any sexual conduct with B. Doe or A. Doe, but when Detective McQuade (falsely) told him his DNA had been found in B. Doe's vagina, Picazo said he might have kissed her buttocks and indicated, with his own drawing and on one by the detective, where he kissed her, how his saliva might have run to her anus or vagina, how he knew he did not kiss her vagina, and that he was not "being sexual." Picazo's story may have been farfetched, but it did put his intent at issue. In fact, while defense counsel orally objected to admissibility under Evidence Code section 1101, subdivision (b), he did not argue Picazo's intent was not at issue; he urged the conduct with K.P. and A.P. was not sufficiently similar to

41

the charged offenses, specifically referring to similarity showing a "common scheme" or "similar crime," and would be prejudicial to Picazo.

Picazo also argues the evidence should have been excluded under Evidence Code section 352 as more prejudicial than probative, emphasizing that because evidence of uncharged offenses is inherently prejudicial, it is admissible only if it has " '*substantial* probative value.' " (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 404, quoting *People v. Thompson* (1980) 27 Cal.3d 303, 318.) The "principal factor" affecting the probative value of the evidence is its tendency to demonstrate the existence of the issue for which it would be admitted. (*Ewoldt*, at p. 404.) As we have said, the behavior K.P. and A.P. described was of a highly similar nature, albeit not identical to the sort of grooming behavior B. Doe and A. Doe described. While it did not progress to overt molestation, it plainly reflected the sexual intent exhibited in Picazo's conduct with B. Doe and A. Doe, refuting Picazo's assertion of a different intention. Significantly, K.P. and A.P.'s testimony was considerably less inflammatory than B. Doe and A. Doe's, reducing the potential for prejudice. (*Id.* at p. 405.)

The trial court did not abuse its discretion in admitting this evidence.

## III.

### *The Trial Court Did Not Abuse its Discretion in Admitting Evidence of CSAAS*

Picazo next contends the trial court erred in admitting expert testimony on CSAAS and instructing the jury this evidence could be considered in evaluating the believability of B. Doe and A. Doe's testimony. The trial court admitted this evidence over Picazo's Evidence Code section 352 objection, stating that there was a delay in the victims' report of abuse and "part of the reason for having the CSAAS testimony" is to explain the delay. The prosecutor confirmed that the expert did not know and would not

42

testify about any specifics of this case and would "just be testifying generally to Child Sexual Assault Accommodation Syndrome."

The California Supreme Court, in *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300, approved a series of appellate decisions establishing that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused" but "it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." " ' "Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." ' (*Id.* at p. 1301.) Such evidence 'is not admissible to prove that the complaining witness has in fact been sexually abused.' (*Id.* at p. 1300.) 'The expert is not allowed to give an opinion on whether a witness is telling the truth . . . .' (*People v. Long* (2005) 126 Cal.App.4th 865, 871.) CSAAS evidence has been admitted by the courts of this state since the 1991 *McAlpin* decision." (*People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*).)

Picazo acknowledges that California law allows for the admission of CSAAS evidence for certain limited purposes but argues this law should be changed to adopt the rule followed in states that make such evidence inadmissible for any purpose. *Munch* rejected such an argument, explaining that *McAlpin* "is binding on all lower courts in this state. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) That other jurisdictions may disagree with it does not change its impact on California cases." (*Munch, supra,* 52 Cal.App.5th at p. 468.)

43

*Munch* also rejected Picazo's argument that CSAAS evidence is inadmissible under the *Kelly/Frye*[18] test. (*Munch, supra*, 52 Cal.App.5th at pp. 472–473; accord, *Lapenias, supra*, 67 Cal.App.5th at p. 173.) " 'Under the *Kelly/Frye* test, when expert testimony based on a new scientific technique is offered, the proponent of the testimony must first establish the reliability of the method and the qualifications of the witness. "Reliability of the evidence is established by showing 'the procedure has been generally accepted . . . in the scientific community in which it developed . . . .' " ' (*People v. Harlan* (1990) 222 Cal.App.3d 439, 448.) [¶] . . . [¶] But here we are not dealing with *new* experimental scientific evidence ' "not previously accepted in court." ' ([*Harlan*], at p. 449; see *People v. Phillips* (1981) 122 Cal.App.3d 69, 87 ['We are not confronted here with the admissibility of evidence developed by some new scientific technique such as voiceprint identification'].) [¶] The CSAAS evidence [defendant] challenges has been ruled to be properly admitted by the courts of this state for decades. [Citations]." (*Munch*, at p. 472.)

Further, CSAAS testimony is " 'based on [the expert's] clinical experience with child sexual abuse victims and on [his or] her familiarity with professional literature in the area.' (*People v. Harlan, supra*, 222 Cal.App.3d at p. 449.) 'The *Kelly/Frye* rule does not apply to this type of evidence.' (*Ibid.*; *People v. Gray* [(1986)] 187 Cal.App.3d [213,] 218–219 [*Kelly/Frye* does not apply].)" (*Munch, supra*, 52 Cal.App.5th at p. 472.)

---

[18] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013.

The rule is more aptly " 'now the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*.' " (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 173, fn. 2 (*Lapenias*), quoting *People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8.)

"CSAAS testimony does not purport to provide a definitive truth; rather, the expert testimony attempts to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused. In short, expert CSAAS testimony is not ' " 'scientific evidence' " subject to the *Kelly* rule. ([*Harlan*], at pp. 448–449 ['The [*Kelly*] rule does not apply to [CSAAS] evidence'].)" (*Lapenias, supra*, 67 Cal.App.5th at p. 173.)

Picazo also argues that even if admissible, the CSAAS evidence was improperly used to bolster the witnesses' credibility. The jury was instructed pursuant to CALCRIM No. 1193 as follows: "You heard testimony from Miriam Wolf regarding Child Sexual Abuse Accommodation Syndrome. Miss Wolf's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence the defendant committed any crimes charged against him or any conduct with which he was not charged. You may consider this evidence only in deciding whether or not [B.] Doe's and [A.] Doe's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of their testimony." Picazo argues this instruction is internally inconsistent because using CSAAS evidence to evaluate the victim's believability "is the same as" using the evidence to determine whether the victim's molestation claim is true.

This challenge to CALCRIM No. 1193 has also been rejected. " 'The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. *The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior*. Thus, under CALCRIM

45

No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction.' " (*Munch, supra,* 52 Cal.App.5th at p. 474, quoting *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504; accord, *Lapenias, supra,* 67 Cal.App.5th at pp. 175–176.)

We agree with the reasoning and conclusions of these cases. The jury was properly instructed, and the expert witness expressly testified that CSAAS is not a recognized diagnosis and should not be used to determine whether a person has experienced sexual abuse, and that her testimony was not meant to determine whether the alleged abuse occurred.

We find no error with respect to the CSAAS evidence.[19]

## IV.

Picazo was sentenced to a determinate prison term of 10 years and eight months consecutive to an indeterminate term of 50 years to life. As earlier noted, the determinate sentence included the upper term of eight years on count 1, plus consecutive one-third middle terms on counts 3 and 5 and concurrent middle terms on counts 2, 4, 6, and 18.

At the time Picazo was sentenced, section 1170, subdivision (b), gave the trial courts broad discretion to decide which of the three terms specified for an offense would best serve the interests of justice. (See § 1170, subd. (b), as amended by Stats. 2020, ch. 29, § 14.) Subsequently, effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.) amended section 1170, subdivision (b), in a number of respects, one of which was to make the middle

---

[19] Having rejected Picazo's individual claims of error, we necessarily reject his contention that the cumulative effect of the errors denied him a fair trial.

term of imprisonment the presumptive sentence.  (§ 1170, subd. (b)(2); Stats. 2021, ch. 731, § 1.3.)  Under the amended statute, "[W]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (§ 1170, subd. (b)(1).)  "A trial court may impose an upper term sentence only where there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt.  (§ 1170, subd. (b)(1)–(2).)" (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.)

The parties agree that the Senate Bill No. 567 (2021–2022 Reg. Sess.) amendments apply retroactively to this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal.  (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308.)  (*People v. Flores* (2021) 73 Cal.App.5th 1032, 1038.)[20]  They further agree that this case should be remanded for resentencing because the aggravating circumstances the trial court relied upon were neither stipulated nor found true beyond a reasonable doubt by the jury.

We agree.  The court explained that it was imposing the upper term on count 1 (touching B. Doe's vagina when she was approximately five years old) because the victim was "very young," vulnerable and "in the defendant's care (Cal. Rules of Court, rule 4.421(a)(3) [victim "particularly vulnerable"]),

---

[20] " 'For the purpose of determining the retroactive application of an amendment to a criminal statute, the finality of a judgment is extended until the time has passed for petitioning for a writ of certiorari in the United States Supreme Court.'  ([*People v. Lopez* (2019) 42 Cal.App.5th 337,] 341– 342, citing *People v. Vieira* (2005) 35 Cal.4th 264, 305–306.)"  (*People v. Flores, supra,* 73 Cal.App.5th at p. 1038.)

Picazo was convicted of other crimes for which consecutive sentences could have been imposed but concurrent sentences would be imposed (Cal. Rules of Court, rule 4.421(a)(7), there was "some level of sophistication" (Cal. Rules of Court, rule 4.421(a)(8) ["manner in which the crime was carried out indicates planning, sophistication, or professionalism"]),[21] Picazo took advantage of a position of trust (Cal. Rules of Court, rule 4.421(a)(11)), and Picazo's conduct indicated a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)). The court additionally observed that Picazo's conduct "had an extremely negative impact on the victim's life and has been affecting her well over a decade and appears it will for the rest of her life," and found Picazo's remorse was not "really genuine," as Picazo had not expressed remorse before the morning of sentencing and what he said "did not strike me as being . . . very genuine."

None of the circumstances the trial court relied upon were established by stipulation or jury finding beyond a reasonable doubt. The Attorney General does not suggest the error was harmless. Remand is appropriate.

Picazo urges he should also be resentenced on the subordinate counts. On remand, pursuant to the full resentencing rule, the trial court will have the opportunity to revisit all its sentencing decisions. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.)

## V.

As earlier noted, the trial court ordered Picazo to pay $700 to the Daly City Police Department for the forensic examination at the Keller Center.

---

[21] The court saw sophistication in Picazo's "concocting this test for [B.] Doe," which it recognized pertained to a different count when B. Doe was older but still thought "shows the sophistication that was used here." The court noted that if this factor could not be considered for count 1, the sentence would remain the same based on the other factors the court was relying on.

The trial court's oral imposition of this fee referred to the "forensic exam at the Keller Center" and the court's minutes indicate it was for "the Keller Center Interview." The abstract of judgment, however, lists it as victim restitution pursuant to section 1202.4, subdivision (f). Picazo contends this restitution award must be stricken as unauthorized because the police department is not a "direct victim" within the meaning of section 1202.4.[22]

The People agree that the $700 is not payable as victim restitution. A governmental agency is a "victim" for purposes of section 1202.4 "when that entity is a direct victim of a crime." (§ 1202.4, subd. (k)(2).) Entities that are " 'direct' victims of crime" are those " '*against which* the [defendant's] crimes [were] committed'—that is, entities that are the 'immediate objects of the [defendant's] offenses.' " (*People v. Martinez* (2005) 36 Cal.4th 384, 393, quoting *People v. Birkett* (1999) 21 Cal.4th 226, 232–233.)

As the People point out, however, the abstract of judgment also lists, under "[o]ther orders" (item 12), "$700 ordered paid to Daly City PD-interview duration." This notation is consistent with the trial court's orally stated order for Picazo to "pay $700 to the Daly City Police Department for the forensic exam at the Keller Center." The probation report had recommended that Picazo be required to pay $700 to the Daly City Police Department for the forensic examination at the Keller Center pursuant to section 1203.1h, subdivision (b) (payment of medical examination costs). Accordingly, the People argue the order to pay $700 to the Daly City Police Department should stand. Picazo "does not disagree"; he argues only that the fee should not have been imposed twice and is not valid as victim restitution.

---

[22] Section 1202.4, subdivision (f), provides, in pertinent part, that "[i]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order."

The abstract of judgment must be corrected by striking the provision for payment of $700 as victim restitution to the Daly City Police Department. The order for payment of $700 to the Daly City Police Department indicated as item 12 on the abstract of judgment shall remain.

## VI.

Picazo also argues the trial court violated his constitutional rights by imposing a court facilities assessment, court operations fee, and restitution fine without a showing of ability to pay. He contends he received ineffective assistance of counsel due to his attorney's failure to object under *People v. Duenas* (2019) 30 Cal.App.5th 1157). We need not address this issue because, as the Attorney General suggests, Picazo will be able to raise his ability to pay arguments at resentencing.

## DISPOSITION

The abstract of judgment shall be corrected by striking the provision for payment of $700 as victim restitution to the Daly City Police Department. The matter is remanded for resentencing in light of section 1170, subdivision (b), as amended by Senate Bill No. 567. In all other respects, the judgment is affirmed.

_____
Mayfield, J.*

We concur:

_____
Richman, Acting P.J.

_____
Miller, J.

*People v. Picazo* (A161621)

* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

51

Trial Court:                        San Mateo County Superior Court

Trial Judge:                        Hon. Jeffrey Finigan


Attorney for Appellant:             By appointment of the Court of Appeal
                                    under the First District Appellate Project
                                    Danalynn Pritz


Attorneys for Respondent:           Attorney General of California
                                    Rob Bonta

                                    Lance E. Winters
                                    Chief Assistant Attorney General

                                    Jeffrey M. Laurence
                                    Senior Assistant Attorney General

                                    Catherine A. Rivlin
                                    Supervising Deputy Attorney General

                                    Allen R. Crown
                                    Deputy Attorney General